Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/13/2021 08:13 AM CDT

Patricia A. Seivert, appellee and
cross-appellant, v. Tyron A.
Alli, appellant and
cross-appellee.

___ N.W.2d ___

Filed May 21, 2021.    No. S-20-209.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law that an appellate court resolves independently of the trial court.

5. **Statutes: Intent.** When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context.

6. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

7. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

8. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

9. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

10. ____: ____. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

11. **Divorce: Property Division: Appeal and Error.** As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. The date of valuation is reviewed for an abuse of the trial court's discretion.

12. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

13. **Divorce: Property Division.** In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities of the situation.

14. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

15. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. The ultimate criterion is one of reasonableness.

16.  ____: ____. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.
17. **Divorce: Attorney Fees.** In dissolution proceedings, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

Kelly T. Shattuck, of Vacanti Shattuck, for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.
Tyron A. Alli appeals and Patricia A. Seivert cross-appeals the district court's decree dissolving the parties' marriage and dividing the marital estate. Both parties assign multiple errors. For the reasons discussed below, we affirm.

## I. BACKGROUND

In December 2013, Seivert filed a complaint against Alli in the district court for Douglas County seeking a dissolution of their marriage. At the time the complaint was filed, the parties had four minor children, born in 1998, 2000, 2003, and 2004. Earlier in 2013, Alli had moved out of the home in which he, Seivert, and the children had lived.

The parties attempted to resolve disputed issues over the next several years. The matter eventually went to trial in July 2019. The disputed issues included the following: if and when the parties were married; if the parties were not married, whether they should be treated as putatively married under Neb. Rev. Stat. § 42-378 (Reissue 2016); the date on which the marital estate should be identified and valued; the valuation of Alli's business interests; and whether Alli should be obligated

to pay alimony. Evidence presented at trial relevant to the parties' assignments of error is detailed later in this opinion.

On January 13, 2020, the district court entered a decree dissolving the marriage. The district court found that the parties were married on January 26, 2012, rejecting both Seivert's arguments that the parties were either validly or putatively married in 1996, as well as Alli's argument that the parties were never married.

The decree adopted the parties' existing parenting plan, which awarded sole legal and physical custody of the minor children to Seivert subject to Alli's parenting time. By the time of the decree, only two of the parties' children were minors.

The decree ordered Alli to pay Seivert $8,390 per month in child support, $5,000 per month for 60 months in alimony, and $50,000 for attorney fees. The decree further ordered Alli to continue to pay tuition and educational expenses for the minor children to attend the private high school in which they were enrolled. It also provided, "The children's 529 accounts or other accounts held for the benefit of the children shall be held by [Seivert] as a constructive trustee and/or custodian for the benefit of the minor children and their educational expenses." In dividing the marital estate, the district court awarded to Alli a bank account containing $304,130 that the parties used to pay the minor children's private school tuition.

Using January 26, 2012, as the date of the marriage, the district court divided the marital assets between the parties. The court utilized the date of trial as the valuation date for the division of the assets. Accordingly, the district court included in the marital estate an investment account and equity in a home that Alli purchased in 2014, both of which were funded by Alli with postcomplaint and postseparation earnings.

In valuing Alli's business interests, the district court found that "the valuation of [Alli's] business interests are most accurately determined by relying on [Alli's] existing business and buy/sell agreement terms." The district court awarded the marital portion of Alli's business interests to Alli.

The district court ordered Alli to make an equalization payment to Seivert of over $1.2 million. It also directed Alli to assign to Seivert over $800,000 in his retirement accounts to equalize the division of assets.

After the district court overruled Alli's motion for new trial and Seivert's motion to alter or amend, Alli appealed and Seivert cross-appealed.

## II. ASSIGNMENTS OF ERROR

Alli assigns that the district court erred (1) by including in the marital estate property that he obtained after the parties separated and the complaint for dissolution was filed, (2) by ordering him to pay alimony, (3) by ordering him to pay attorney fees, and (4) by dividing an account intended for the minor children's school tuition while also ordering him to be responsible for those costs.

In her cross-appeal, Seivert assigns that the district court erred (1) in its determination of the value of Alli's business interests and (2) in its failure to find that the parties were putatively married in June 1996.

## III. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Higgins v. Currier*, 307 Neb. 748, 950 N.W.2d 631 (2020).

[2] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[4] Statutory interpretation presents a question of law that an appellate court resolves independently of the trial court. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018).

## IV. ANALYSIS

### 1. Seivert's Cross-Appeal

#### (a) § 42-378

We begin with Seivert's argument that the district court erred when it declined to treat the parties as putatively married in 1996 under § 42-378. Although Seivert provides little in the way of specifics, she generally contends that if the district court had found the parties were putatively married in 1996, the marital estate would have been larger and she would have been entitled to a larger equalization payment. Because the resolution of this issue could possibly impact the resolution of other assigned errors, we address it first.

#### (i) Additional Background

During the course of the proceedings, both parties took multiple positions as to whether and when they were married. In her initial complaint, Seivert alleged that the parties were married in Omaha, Douglas County, Nebraska, on June 16, 1996. In Alli's answer to the initial complaint, he denied that the parties were married in Douglas County in 1996 and alleged that the parties were married in Douglas County on January 26, 2012.

In an amended complaint, Seivert changed her allegations regarding the date of the marriage. She alleged that "[o]n or about" June 18, 1996, she "in good faith participated in a marriage ceremony and accordingly was married to [Alli] in Kauai, Hawaii." She alleged that the parties renewed their vows on January 26, 2012, in Douglas County. Alli then changed his

allegations regarding the date of the marriage in his answer to the amended complaint. He denied Seivert's allegations and alleged that no marriage ceremony took place in either 1996 or 2012. He asked that the district court declare that the parties were never married and dismiss Seivert's complaint.

Whether and when the parties married remained a disputed issue at trial, and both parties testified regarding the subject. Seivert testified that she and Alli met in 1994 and became engaged to be married in 1995. According to Seivert, she and Alli planned a trip to Hawaii in June 1996, where they intended to get married and have a honeymoon. Shortly before leaving for Hawaii, they obtained a marriage license application from the Douglas County clerk's office. They partially completed the application, but did not sign or file it, and they did not participate in a marriage ceremony in Nebraska at that time. Seivert testified that in Hawaii, she and Alli signed some papers and participated in a marriage ceremony on the beach by their hotel. She recalled being given some type of certificate, but did not recall what she or Alli did with it.

Alli agreed that the parties were engaged prior to June 1996 and that they traveled to Hawaii in that month, but he testified that they went there solely for a vacation. He denied that they participated in any ceremony in Hawaii and denied that they applied for or obtained a Hawaii marriage license. Alli acknowledged that after returning from Hawaii, the parties consistently represented themselves as husband and wife. According to Alli, he believed the parties were married at the time as a result of their obtaining a license in Douglas County prior to leaving for Hawaii.

Approximately 16 years later, Seivert was asked to provide documentation of her marital status as part of an insurance audit. She testified that she was unable to find the marriage certificate and that she was told by "Hawaii" that any records had been "purged." Because she was unable to locate documentation and did not have time to search further, Seivert testified that she and Alli agreed to obtain a marriage license in

Douglas County and have a ceremony performed. In a handwritten, signed, and dated statement on the marriage license application, Seivert and Alli both acknowledged that they were married in a ceremony in June 1996, but that the marriage certificate paperwork was misplaced and never received by the Douglas County clerk's office. Alli testified he signed the acknowledgment of a prior ceremony because Seivert asked him to, but it was a lie.

Seivert and Alli again provided conflicting testimony about whether a marriage ceremony took place in 2012. Seivert asserted that a ceremony was held in the parties' Omaha home on January 26 of that year. Alli disputed that such a ceremony took place.

As noted above, the district court found that the parties were not validly married in Nebraska or any other state in 1996. It concluded that under Nebraska and Hawaii law, a valid marriage required both a duly obtained license and a ceremony performed by a person licensed to solemnize marriage. The district court found that the parties did not sign and file a Nebraska marriage license in 1996, nor was a ceremony performed in Nebraska in that year. In addition, the district court found a lack of evidence that the parties obtained a marriage license or participated in a marriage ceremony in Hawaii.

The district court also rejected Seivert's argument that it should treat the parties as putatively married in 1996 under § 42-378. The district court concluded that § 42-378 applied only if the parties completed the necessary requirements to enter into a valid marriage and that marriage was later declared a nullity.

The district court rejected Alli's argument that the parties were never married, finding that the parties were validly married in Douglas County in January 2012.

### (ii) Analysis

Seivert's sole argument regarding the date of the parties' marriage is that the district court erred by not treating the

parties as putatively married in 1996 under § 42-378. She does not assign and argue on appeal that the parties were validly married in 1996. Alli likewise does not challenge on appeal the district court's finding that the parties were validly married in 2012. We thus limit our consideration to the question of whether the district court erred by declining to treat the parties as putatively married in 1996 under § 42-378.

Section 42-378 provides:

> When the court finds that a party entered into the contract of marriage in good faith supposing the other to be capable of contracting, and the marriage is declared a nullity, such fact shall be entered in the decree and the court may order such innocent party compensated as in the case of dissolution of marriage, including an award of costs and attorney fees.

Section 42-378 "closely parallels" a doctrine adopted in many other states, either through case law or by statute, referred to as the "putative marriage doctrine." *Hicklin v. Hicklin*, 244 Neb. 895, 901, 509 N.W.2d 627, 631 (1994). As one commentator described the putative marriage doctrine, "it is designed to allow all the civil effects—rights, privileges, and benefits—which obtain in a legal marriage to flow to parties to a null marriage who had a good faith belief that their 'marriage' was legal and valid." See Christopher L. Blakesley, *The Putative Marriage Doctrine*, 60 Tul. L. Rev. 1, 2 (1985).

Seivert argues that the district court should have applied § 42-378, because Seivert and Alli both believed in good faith that they were married in 1996 and lived and represented themselves as a married couple for years thereafter. As Seivert understands § 42-378, it does not matter whether she and Alli obtained a license and participated in a marriage ceremony in either Nebraska or Hawaii in 1996.

We find that Seivert's argument is at odds with both our precedent and the language of § 42-378. Take first our precedent. In the last case in which we considered the applicability of § 42-378, a woman continued to live with her former

husband after their marriage was dissolved under the good faith belief that they remained married. See *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002). Even so, we held that § 42-378 did not permit the district court to treat the parties as putatively married after their marriage was dissolved. We focused on the fact that § 42-378 applies only when "the marriage is declared a nullity" and, in reliance on a legal dictionary, concluded that this occurs only when a presumed or supposed marriage is void or voidable. We reasoned that § 42-378 did not apply under the circumstances, because there was never a void or voidable marriage; the marriage was valid during its duration and then it was dissolved. We also contrasted § 42-378 with statutes in other states that allow a party to obtain relief as a putative spouse by showing only cohabitation with another and a good faith belief that the parties were married. We concluded that § 42-378 did not define the putative marriage doctrine in Nebraska in that manner.

Although *Manker v. Manker, supra*, presented different factual circumstances than this case, we find it instructive here for two reasons. First, in *Manker*, we rejected the argument Seivert essentially presents here: that a party can obtain relief under § 42-378 merely by showing cohabitation and a good faith belief in a valid marriage. Second, we made clear that a party can be treated as a putative spouse only if permitted by the language of § 42-378.

[5-8] Before turning to the language of § 42-378 in the context of this case, we pause briefly to review the familiar principles of statutory interpretation applicable to this analysis. When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context. *In re Guardianship of Eliza W.*, 304 Neb. 995, 938 N.W.2d 307 (2020). Our analysis begins with the text, because statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. See *id.* Neither is it within the

province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute. *Parks v. Hy-Vee*, 307 Neb. 927, 951 N.W.2d 504 (2020). When legal terms of art are used in statutes, they are to be construed and understood according to their term of art meaning. *State ex rel. Peterson v. Creative Comm. Promotions*, 302 Neb. 606, 924 N.W.2d 664 (2019). Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible. *In re Interest of Seth C.*, 307 Neb. 862, 951 N.W.2d 135 (2020).

Applying the foregoing principles, we do not believe that the parties to this case can be treated as putatively married under § 42-378. To obtain relief under § 42-378, a party must "*enter*[] *into the contract of marriage* in good faith supposing the other to be capable of contracting" only for the "marriage" to be "declared a nullity" (emphasis supplied). The statute does not apply merely because a party believes that he or she is validly married or has a subjective desire to be married. Rather, in order for § 42-378 to apply, its language provides that the parties must enter into the contract of marriage. We believe the district court was correct to conclude that this requires parties seeking relief under § 42-378 to show that they completed the necessary legal steps to enter into a contract of marriage.

This conclusion is not inconsistent with our opinion in *Hicklin v. Hicklin*, 244 Neb. 895, 509 N.W.2d 627 (1994), the primary case upon which Seivert relies. In *Hicklin*, we concluded that § 42-378 should have been applied in a case in which a man and woman participated in a marriage ceremony when the man's prior marriage was not yet dissolved. We focused in that case on whether the woman acted in good faith and concluded she did, reasoning that she did not know that the man's marriage was not yet dissolved and, under the circumstances, had no duty to conduct additional inquiry into that question. But there was apparently no dispute in *Hicklin*

that the parties completed the necessary legal steps to enter into a contract of marriage. Our decision today does not disturb our conclusion in *Hicklin* that § 42-378 applies when a party enters into the contract of marriage with a good faith yet mistaken belief that the other party is capable of forming a valid marriage contract. See, also, Neb. Rev. Stat. § 42-103 (Reissue 2016) (setting forth circumstances in which marriages are void).

Given that § 42-378 applies only if the parties completed the necessary legal steps to enter into a contract of marriage, it becomes clear that the district court did not abuse its discretion by concluding the statute did not apply. In 1996, Neb. Rev. Stat. § 42-104 (Reissue 2016) defined how a marriage is contracted in Nebraska, and still does, providing in relevant part that "[n]o marriage hereafter contracted shall be recognized as valid unless such license has been previously obtained and used within one year from the date of issuance and unless such marriage is solemnized by a person authorized by law to solemnize marriages." Hawaii law also required in 1996, as it does now, that parties obtain a license and participate in a ceremony to form a marriage contract. See Haw. Rev. Stat. § 572-1(6) and (7) (1993).

There is no dispute that the parties did not complete and file a Nebraska marriage license in 1996, nor is it disputed that the parties did not participate in a marriage ceremony in Nebraska in that year. The parties disagree about whether they obtained a license and participated in a ceremony in Hawaii in 1996. However, no license was presented at trial, and the district court appears to have credited Alli's testimony that the parties did not obtain a license or participate in a ceremony in Hawaii. Because the question of whether the parties obtained a license and participated in a marriage ceremony in Hawaii turned largely on the testimony of Seivert and Alli and the district court had the opportunity to observe this testimony, we believe deference to its assessment of the issue is warranted. See *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d

481 (2019) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). The district court did not abuse its discretion by declining to find that the parties were putatively married in 1996 under § 42-378.

In reaching this conclusion, we are not without sympathy for Seivert's position. Alli admits that even he believed he was lawfully married in 1996 and represented that was the case to everyone from the Internal Revenue Service, lenders, and employers to family and friends. Under those circumstances, an argument could certainly be made that he should not be able to reap financial benefits from a failure to complete the legal steps to form a marriage. As we have previously explained, however, the matter is governed by statute, and any expansion of this State's putative marriage principles is the province of the Legislature rather than this court. See *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002).

### (b) Valuation of Alli's Business Interests

Seivert also challenges the district court's valuation of Alli's business interests. In particular, she contends that it erred by relying on a buy-sell agreement contained in a limited liability company's operating agreement to determine the value of Alli's ownership interest in the company.

### (i) Additional Background

One of the disputed issues at trial was the marital value of Tyron A. Alli, M.D., P.C. (Alli P.C.), a corporation of which Alli was the sole shareholder. Alli formed Alli P.C. in 1998. Alli worked as a gastroenterologist with what became Midwest Gastrointestinal Associates, P.C. (MGI). After forming Alli P.C., Alli assigned his employment agreements with MGI to Alli P.C. Alli was also a shareholder of MGI.

MGI is the operating branch of Midwest Endoscopy Services, L.L.C. (MES). Upon employment with MGI, a physician may be invited to become a member of MES. Alli P.C. became

a member of MES, and, like all members of MES, it had a 5.88-percent ownership interest.

The operating agreement of MES included provisions that restricted members' rights to sell their interest in MES. The operating agreement generally prohibited a transfer of a member's interest. Upon a "favorable disassociation" from the company, the operating agreement provided that the departing member was obligated to sell his or her interest to the company. The parties called this provision a buy-sell agreement. The buy-sell agreement set forth a formula to determine the price at which MES would purchase the departing member's interest upon a favorable disassociation: twice the previous 12 months' net taxable income divided by the number of members, then multiplied by 102 percent.

The parties presented expert testimony on how Alli P.C.'s value should be calculated. Seivert's expert witness was Gregory Harr, a certified public accountant and accredited business appraiser. Harr testified that he completed a calculation of value of Alli P.C. for both December 31, 2016, and December 31, 2018. He testified that he analyzed Alli P.C.'s value using an income approach and a market approach.

To analyze value using the income approach, Harr considered the income Alli P.C. generated in 2014 through 2018. Harr included both the income Alli P.C. generated as a result of Alli P.C.'s employment agreement with MGI and its ownership interest in MES. After calculating Alli P.C.'s average net operations income less taxes for 2014 through 2018, Harr applied a capitalization rate to determine present value. Using this method, Harr determined that the value of Alli P.C. was approximately $2.28 million on December 31, 2016, and $3.67 million on December 31, 2018.

Harr testified that he also used a market approach in which he analyzed recent sales of comparable medical practices. He testified that he used the market approach as a "sanity check." Harr's opinion as to the value of Alli P.C. corresponded to his determination of value using the income approach.

On cross-examination, Harr admitted that in his valuation of Alli P.C., he did not consider that under the buy-sell agreement, Alli P.C.'s interest in MES could only be sold back to MES at the formula provided therein. He also conceded that he did not consider the fact that in the last several years, a number of physicians had retired from MGI and their interests in MES had been purchased pursuant to the terms of the buy-sell agreement. Finally, Harr acknowledged that he did not apply discounts for lack of control or lack of marketability in calculating the value of Alli P.C.

Alli presented the expert testimony of William Kenedy, a certified public accountant accredited in business valuation. Kenedy reviewed Harr's report and the underlying documents. He opined that Harr's valuation of Alli P.C. was flawed. Kenedy testified that by including income Alli P.C. received through its employment agreement with MGI in determining value under the income approach, Harr improperly placed business value on Alli's employment agreement. Kenedy also testified that by failing to apply discounts to reflect Alli P.C.'s minority status in MES and the restrictions on the sale of the interest, Harr overvalued Alli P.C.'s interest in MES.

In Kenedy's opinion, the proper valuation method was an adjusted asset method, which is based on the net value of the business' assets and debts. Alli P.C.'s assets consisted of cash, a vehicle, and the interest in MES. Kenedy testified that because the interest in MES lacked marketability, it should be valued according to the formula in the buy-sell agreement.

Lori Mueller, who had served as the certified public accountant for Alli's business enterprises since 1997, also testified. Mueller applied the terms of the buy-sell agreement and determined the value of Alli P.C.'s share of MES both as of December 31, 2011, and as of June 30, 2019. She also testified as to the value of the other assets of Alli P.C. as of both December 31, 2011, and as of June 30, 2019. According to Mueller, Alli P.C. had a total value of $869,000 as of December 31, 2011, and $1,093,000 as of June 30, 2019. The latter

number included Alli P.C.'s vehicle, which Mueller's documentation valued at $29,339 as of July 5, 2019. In his testimony, Alli said that he wanted to receive the vehicle in the division of the marital estate.

The district court concluded that the valuation of Alli P.C.'s interest in MES was "most accurately determined" by relying on the terms of the buy-sell agreement. In the exhibit in which it set forth its division of property, it cited to the exhibit summarizing Mueller's calculations of value and awarded Alli P.C. and Alli's other business entities to Alli. The district court determined the marital value of Alli P.C. was $194,661. This value corresponds to the difference between Mueller's 2011 and 2019 valuations, less the value of Alli P.C.'s vehicle, which was awarded to Alli.

*(ii) Analysis*

Seivert contends that the district court abused its discretion in valuing Alli P.C.'s interest in MES. Seivert argues that the district court erred by treating the terms of the buy-sell agreement, a type of redemption agreement, as "controlling" as to the value of Alli P.C.'s interest in MES. Brief for appellee on cross-appeal at 28. She relies on *Brozek v. Brozek*, 292 Neb. 681, 692, 874 N.W.2d 17, 28 (2016), where we observed that "most courts do not treat a redemption agreement as conclusive evidence of a share's value," and she cites cases from other jurisdictions in which courts held that the terms of a redemption agreement are not determinative evidence of value. See, e.g., *Garcia v. Garcia*, 25 So. 3d 687 (Fla. App. 2010); *Von Hohn v. Von Hohn*, 260 S.W.3d 631 (Tex. App. 2008); *In re Marriage of Morris*, 588 S.W.2d 39 (Mo. App. 1979).

We find that Seivert's argument rests on a flawed premise. We do not understand the district court to have treated the buy-sell agreement as *conclusive* as to the value of Alli P.C.'s interest in MES. The district court stated that the value of Alli P.C.'s interest in MES was "most accurately determined" by relying on the terms of the buy-sell agreement. Based on this language, we understand the district court to have evaluated

the buy-sell agreement as one relevant piece of evidence it could consider in determining the value of Alli P.C.'s interest in MES.

Even courts that have held that the terms of a redemption agreement are not conclusive as to the value of a business recognize that such an agreement is relevant to valuation. For example, in one of the cases Seivert relies upon, *Garcia v. Garcia, supra*, the court acknowledged that when stock is subject to a restrictive transfer agreement, the agreement impairs marketability and affects the value and must be considered when the court determines the value of the stock for purposes of equitable distribution. See, also, *In re Marriage of Nevarez*, 170 P.3d 808 (Colo. App. 2007); *In re Marriage of Gillespie*, 89 Wash. App. 390, 948 P.2d 1338 (1997); *Amodio v. Amodio*, 70 N.Y.2d 5, 509 N.E.2d 936, 516 N.Y.S.2d 923 (1987). As one commentator has explained, even if not treated as conclusive, the terms of a redemption agreement are important evidence of the value of the owning spouse's interest:

> Where the agreement was signed in good faith and not in contemplation of divorce, it reflects an attempt by disinterested parties negotiating at arms' length to establish the fair value of the business. As such, it deserves serious consideration, and a higher or lower value should not be reached without substantial supporting evidence.

2 Brett R. Turner, Equitable Distribution of Property § 7:19 at 1133 (4th ed. 2020).

Here, although the district court did not believe it was bound to follow the terms of the buy-sell agreement in determining Alli P.C.'s interest in MES, it did ultimately conclude that the value was best determined by applying the terms of the buy-sell agreement. Under the circumstances, we cannot say that was an abuse of discretion. According to Kenedy, Harr significantly overvalued Alli P.C.'s interest in MES by including Alli P.C.'s income under the employment agreement when valuing Alli P.C. using the income approach, by failing to consider the buy-sell agreement, by failing to consider

that other recently departed physicians had their interests in MES bought out pursuant to the buy-sell agreement, and by generally failing to apply discounts for lack of marketability and lack of control. The district court was entitled to ascribe weight to Kenedy's testimony and thus conclude that Harr's valuation was flawed. A number of appellate courts have held that trial courts do not commit reversible error by following a redemption agreement's determination of value rather than that of an expert who fails to consider the agreement in forming an opinion as to value. See, e.g., *In re Watterworth*, 149 N.H. 442, 821 A.2d 1107 (2003); *In re Marriage of Gillespie, supra*; *Amodio v. Amodio, supra*. Cf. *In re Marriage of Decosse*, 282 Mont. 212, 936 P.2d 821 (1997) (holding that trial court erred by accepting expert valuation that failed to take redemption agreement into account).

The district court did not abuse its discretion in valuing Alli's business interests.

## 2. Alli's Appeal

### (a) Valuation Date

Alli's first assignment of error is that the district court erred by using the date of trial to identify and value property composing the marital estate.

### *(i) Additional Background*

As noted above, the parties separated and Seivert filed her initial dissolution complaint in 2013, but the matter did not proceed to trial until July 2019. Alli testified that in the intervening years, he worked additional hours and lived frugally. According to Alli, he used his earnings in those years to pay off the marital home, Seivert's motor vehicle, and other expenses incurred by Seivert and the children. Alli testified he paid these expenses "to make sure the kids were comfortable and have [Seivert] be in a place that she can take care of them." Alli also testified that he used money he earned during the time between the parties' separation and trial to contribute

approximately $1.1 million to an investment account and to purchase a residence with a total equity of $481,445.

From the time the parties separated in 2013 through trial in 2019, the minor children resided with Seivert in the family home. The parties agreed to a parenting plan in July 2014. It gave Seivert sole legal and physical custody of the minor children, with Alli's parenting time at Seivert's discretion. Seivert testified that during the 6 years preceding trial, Alli had not requested time with the children and she provided care "24/7." She acknowledged that on one occasion in 2017 or 2018, Alli had stayed in the home when she was out of town for work, and that on another, one of the minor children had spent one night at Alli's house.

Alli testified that he communicated with the children at least once a week. He asserted he had not requested parenting time because he wanted the children to be comfortable rather than "bouncing back and forth."

### (ii) Analysis

[9,10] In a divorce action, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). Under § 42-365, the equitable division of property is a three-step process. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.*

Alli contends that the district court erred by identifying and valuing the property composing the marital estate as of the date of trial. Because the district court used the date of trial to

identify and value the marital estate, amounts Alli earned and invested after Seivert filed for divorce were included and subject to equitable division. This, Alli contends, is unfair under the circumstances.

[11] As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019). The date of valuation is reviewed for an abuse of the trial court's discretion. *Id.*

Alli earned and invested substantial sums during the period between the parties' separation and trial. During this time, however, the evidence shows that Seivert was providing almost exclusive care for the parties' minor children and, thus, to at least some extent, made Alli's earnings possible. The valuation date applied by the district court was rationally related to the property composing the marital estate, and we thus find no abuse of discretion.

## (b) Alimony

Alli next argues that the district court erred by ordering him to pay $5,000 per month in alimony for 60 months.

### (i) Additional Background

At the time of trial, Seivert was working part time as a pediatrician, earning $87,768 per year. By contrast, according to Alli's suggested child support calculation, in 2016, 2017, and 2018, his total income averaged $131,991 per month. Alli's 2018 tax return showed the compensation Alli received that year from his corporate interests: From Alli P.C., he received $490,441 for officer compensation, $271,565 for pension, and $964,838 for ordinary business income; and from other medical corporations in which he had an interest, he received a total of nearly $100,000 in ordinary business income.

According to Seivert, the parties' children were always her main focus and she gave them and Alli's career priority over her own career. Seivert practiced full time as a pediatrician until the year after the parties' first child was born, when

she began working part time. Alli practiced gastroenterology on a full-time basis during all relevant times. Seivert testified that Alli helped with the children when he was available, but his focus was on his career.

Alli testified that Seivert could have been earning more. He testified that pediatricians who start full time in private practice earn $180,000 to $190,000 per year. Seivert testified that she has focused on treating children who have no insurance or are on Medicaid and that her practice is therefore less lucrative.

### (ii) Analysis

Alli argues that the district court's award of alimony was an abuse of discretion. He primarily asserts that the award of alimony was unwarranted because Seivert did not need it. He contends that she could earn more money and that she overstated her expenses.

[12-14] In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.*

[15,16] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to

disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Having reviewed the record de novo, we do not believe this alimony award is untenable or patently unfair on the record. The evidence in the record shows that Alli earns substantially more income than Seivert. It also shows that Seivert sacrificed personal career advancement to care for the parties' children. Further, even assuming that Seivert is capable of earning additional income, there is a wide disparity of earning capacity between the parties. The district court's award of alimony was not an abuse of discretion.

### (c) Attorney Fees

Alli also argues that the district court erred by ordering him to pay $50,000 of Seivert's attorney fees.

### (i) Additional Background

Prior to trial, the district court entered a temporary order directing Alli to deposit $15,000 for expert fees and $10,000 for attorney fees in the trust account of Seivert's attorneys. In the decree, the district court ordered Alli to pay the clerk of the court $50,000 for the use and benefit of Seivert's attorneys.

### (ii) Analysis

Alli's argument regarding the district court's award of attorney fees borders on conclusory. He asserts that the district court should not have ordered him to pay Seivert's attorney fees because she is a physician capable of earning a significant income and could pay her own attorney fees. Alli does not specifically challenge the amount he was ordered to pay in attorney fees.

[17] We have said that in dissolution proceedings, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Schaefer v. Schaefer*, 263 Neb. 785, 642 N.W.2d 792 (2002). In dissolution cases, attorney fees may also be awarded to

prevailing parties. See, e.g., *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019).

The district court did not explain its reasoning for its attorney fees order in the decree. However, we cannot say that it was untenable. As noted above, there was a significant gap between Alli's earning capacity and Seivert's earning capacity. Further, although Seivert did not prevail in every argument she presented at trial, she was successful in overcoming Alli's argument that the parties were never married and that the district court should therefore dismiss the action entirely. Under these circumstances, we find that the district court did not abuse its discretion in awarding Seivert attorney fees.

### (d) Educational Support Obligation

Finally, Alli argues that the district court erred by requiring him to continue to pay the educational expenses of the parties' minor children. He contends that the district court required that he continue to pay the children's educational expenses but awarded Seivert half of the account the parties had previously used to pay those expenses. This, Alli asserts, was "double dipping." Brief for appellant at 18. He asks that we either award him the bank account or relieve him of his obligation to pay all of the expenses for the children's education.

### *(i) Additional Background*

Evidence admitted at trial showed that the minor children's private school tuition and related expenses were paid from a joint savings account that contained approximately $304,000 at the time of trial. The parties referred to this account as the "MES account," as did bank statements that were received into evidence. The parties also maintained a 529 college savings account for the children's college tuition.

In the decree, the district court ordered Alli to continue to pay the tuition and other necessary expenses for the minor children to continue to attend their private school. The decree specifically addressed how the district court was dividing several assets. It provided that "[t]he children's 529 accounts or

other accounts held for the benefit of the children shall be held by [Seivert] as a constructive trustee and/or custodian for the benefit of the minor children and their educational expenses." It also provided that any asset not specifically divided in the body of the decree was to be divided as set forth in an attached exhibit. The attached exhibit listed several assets and amounts, and it included separate columns for Seivert and Alli. An asset labeled as "Savings MES" with a value of $304,130 was listed in Alli's column. A bank statement received into evidence showed that the "MES account" referred to by the parties as the account used to pay the minor children's tuition contained $304,130.37 as of April 2019.

*(ii) Analysis*

Alli contends that the district court should not have ordered him to pay the educational expenses while also awarding a portion of the account used to pay those expenses to Seivert. But the district court did not award the account used to pay the educational expenses to Seivert. As explained above, the decree awarded that account to Alli. And to the extent Alli argues that the district court erred in ordering him to pay the tuition expenses while also attributing the value of the account to him and thereby increasing the equalization payment owed to Seivert, considering the value of the account relative to the size of the marital estate, we discern no abuse of discretion. See *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019) (as general rule, spouse should be awarded one-third to one-half of marital estate, the polestar being fairness and reasonableness as determined by facts of each case).

We find that the district court did not abuse its discretion in ordering Alli to pay the children's educational expenses.

## V. CONCLUSION

We find no merit to either party's assigned errors and therefore affirm.

Affirmed.