IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

DOZIER V. WEBER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KAYLA M. DOZIER, APPELLEE,

V.

ASHTON L. WEBER, APELLANT.

Filed September 21, 2021.    No. A-20-878.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed.

Adam E. Astley, of Astley Putnam, P.C., L.L.O, for appellant.

Ryan K. McIntosh, of Brandt, Horan, Hallstrom & Stilmock, for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Ashton L. Weber appeals the order of the Otoe County District Court denying his complaint to modify a paternity decree. Weber contends that the court abused its discretion in failing to find that a material change in circumstances had occurred warranting a modification of the paternity decree, in declining to award him legal and physical custody of his two minor children, and in declining to order Kayla M. Dozier to pay child support. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

Weber and Dozier are the biological parents of twin sons, Greyson Oliver Weber and Henry Wayne Weber, born in 2014. In February 2018, the district court entered a decree finding that Weber was the boys' father, awarding the parties joint legal custody, awarding Dozier primary physical custody, and granting Weber parenting time every other weekend from 6 p.m. on Thursday until 6 p.m. on Sunday. If the children were enrolled in school, Weber's parenting time was modified from 6 p.m. on Friday until 6 p.m. on Sunday. The parties were to alternate visitation

- 1 -

on major holidays and alternate a 2 weeks on/2 weeks off parenting time schedule during the summer. Weber was ordered to pay $979 in monthly child support. Further, Weber was awarded one dependency exemption "conditionally upon [Weber] remaining current in payment of his obligations as set forth herein." The parenting plan further provided that Weber and Dozier

> agree that if the conversation becomes tense, either parent may end the conversation. If they need to break off a conversation, either parent can send a text message when they are ready to restart the conversation. If the other parent is not ready to restart the conversation, he/she will let the other parent know within 24 hours when a better time will be.

### 1. PROCEDURAL BACKGROUND

In June 2019, Dozier filed a complaint to modify the paternity decree in which she requested permission to relocate with the minor children to Colorado due to an employment opportunity. Weber filed an answer and counter-complaint requesting sole legal and physical custody of the children subject to Dozier's parenting time and requesting a modification of child support requiring Dozier to pay child support pursuant to the Nebraska Child Support Guidelines. Weber alleged that a material change in circumstances had occurred warranting a modification of custody, parenting time, and support for reasons including but not limited to the following:

a. [Dozier] has not provided a stable environment for the minor children in that she has moved frequently and is now wanting to remove them from the State.

b. [Dozier] does not do a lot of the parenting during her awarded time, she allows her parents to raise the children while she is absent.

c. Co-parenting has been difficult due to [Dozier's] lack of cooperation and flexibility, refusal to communicate, and failure to put the best interests of the children before her negative feelings toward [Weber].

d. A change in custody would warrant a change in the support currently ordered and the Parties should engage in discovery to determine the appropriate amount of support to be paid if the Court is inclined to grant the relief [Weber requested] with regard to custody and parenting time.

Dozier subsequently filed a motion to dismiss her complaint which was granted by the court in June 2020, leaving only the claims remaining presented in Weber's counter-complaint.

### 2. MODIFICATION HEARING

In August 2020, the court held the modification hearing on Weber's counter-complaint. The following witnesses testified: Dozier; Weber; Joan Weber, Weber's wife; and Tim Dozier, Dozier's father.

#### (a) Work Schedule, Relationship, and Parent Care

Although Dozier originally planned to take a nursing position in Colorado, she instead took a job in Council Bluffs, Iowa. Dozier stated that the two positions were comparable considering the cost of living between Nebraska and Colorado. She said that she believed that it would be

easier for everyone if she stayed and worked at her current position. She stated that she was considering the Colorado position because it was unclear to her whether she would be able to advance to a supervisory role at her current job. At the hearing, Dozier indicated that she no longer planned to move to Colorado and that she and her boyfriend were in the process of closing on a home in Papillion, Nebraska. Dozier has known her boyfriend for 9 years, and he recently moved to Nebraska from Wyoming for a new job. Dozier stated during that 9 years, she and her boyfriend were close friends. She stated that he did not have a criminal record and all his interactions with her children have been healthy. She said, "they play a lot and he does a really good job with them." They entered into a romantic relationship a year prior to the hearing and the boys have become very close with her boyfriend. Dozier testified that the hope was that the two would get married within the next year, although there was no date set.

When the original decree was entered, Dozier was in nursing school, and had since became a full-time nurse. She was also currently taking classes online with the expectation of graduating in May 2022 with a master's degree. Dozier accepted the nursing position in August 2019 which required her to work two or three nights per week from 6:30 p.m. to 7 a.m. as well as occasionally picking up extra shifts when she did not have the children with her. The days she specifically worked alternated from week to week, but her typical schedule was Tuesday, Wednesday, Thursday, and some Sundays. Dozier stated that she did not take additional shifts during daytime hours. She stated that if she did take on additional hours, which she normally did not do, those shifts were also overnight. Dozier generally took extra shifts when the boys were sleeping and sometimes they started later so she could be there to send them off to bed before work. During her overnight shifts, the children stayed with Dozier's parents and Dozier's mother took the children to school where she was employed as a secretary. On a typical work night, Dozier dropped the children off at her parents' home around 5:30 p.m. and then would leave for work. Since her mother took them to school on those mornings, Dozier would arrive at the school at 3 p.m. to take them home. Dozier picked the children up from school every day, and on days when Dozier was not working, she also took the children to school. Because Dozier was injured in a car accident, at the time of the hearing, she was on short-term disability and was expecting to return to her normal schedule at the end of the month. Dozier stated that the prior routine for the boys would likely change since she and her boyfriend moved in together and he would be home at night to watch the children. She stated that the home they were purchasing was closer to her job so her drive time will be shorter and she would get more time with the boys.

Dozier's parents provided support for Dozier when she needed help. Tim stated that they spent a lot of time with their grandchildren, but they loved to do so and help out where they could. He said that a lot of grandparents spend a lot of time with their grandchildren. He stated that when Dozier dropped the boys off, she sometimes spent a few hours with them before going into work depending on her start time. Tim said that he witnessed interactions between Dozier and her children and he believed that they had a safe, stable and loving home. Tim testified that he and his wife usually took the boys when Dozier was working, but he believed that they had probably taken them on other occasions as well. He stated that the children had not stayed with him when Dozier took vacations. Dozier stated that they went on vacations together as a family, or she went during times that she did not have the children. Dozier, her boyfriend, and the children traveled together

and appeared to participate in a lot of family time together. The record reflects that Dozier utilized her support system while she worked to include her parents and her boyfriend who enjoyed spending time with the boys. Dozier stated that they went to the zoo together, played games, ate together, spent time at home, read together, went the park, watched movies, went on walks, and enjoyed the time they had with each other. Dozier stated that she believed that she provided a positive home life for her children.

(b) Communication and Parenting Time

Both parties acknowledged that their communication was poor. Weber testified that Dozier did not always answer his phone calls, that he was not always made aware of the children's appointments and events, and that he was not consulted about fundamental decisions regarding the children. He also testified that he felt like Dozier did not value his opinion when it came to the decisions affecting the children. Specifically, Weber testified that Dozier usually took the children to their events including wrestling matches or school concerts and that he was not always notified of the children's events. However, Weber admitted that he had access to, and previously received, the children's school calendar which listed event details. Dozier stated that she had notified Weber about the children's events, but that one event was a last-minute decision, so she did not notify him of that event in advance.

Dozier also acknowledged that at certain times when the parties were hostile, she did not always promptly respond to Weber to de-escalate the situation. Dozier indicated that the decree provided this as a safety measure to ensure that the parties could walk away if the conversation became hostile or aggressive. Dozier testified that the parties' communication was getting better and she did not believe that the parties' communication issues necessarily affected the children, but only affected the parties' relationship with each other.

The parties' lack of communication was relevant specifically during the parenting time exchanges. Weber indicated that although he had actively participated in parenting time with the children, he felt like Dozier was not willing to work with him because she had not been receptive to his requests such as his request not to bring the children for visits if one or both of them were sick or his request to cancel or modify parenting time due to inclement weather. Weber also testified that when he requested that he have the children during his wedding weekend, Dozier did not want to give up her weekend to accommodate him. In response, Dozier testified that she did allow the boys to attend Weber's wedding. Further, in response to Weber's suggestion that she does not accommodate parenting time exchanges, Dozier indicated that she was open to them but that each situation was fluid depending upon the situation and what was going on and that would impact whether Weber would agree to a change.

Weber also testified that he became upset when Dozier denied his request for the children to come to the hospital during Dozier's parenting time so that they could meet their baby brother. Weber testified that he felt that Dozier did not foster the children's relationship with Weber's other two children. Dozier indicated that she did not interfere with the relationship between the children, Weber's wife, or the children's relationship with their siblings.

Weber described an argument that occurred over his desire to care for Henry following a car accident which resulted in Dozier and Greyson sustaining injuries, but in which Henry was

unharmed. Weber asserted that Dozier's father refused to allow Weber to take Henry because it was Dozier's parenting time. In response, Dozier reported that although Weber believed she was incapacitated due to her injury and would be unable to care for Henry, in actuality, Dozier was discharged from the hospital on the day of her accident subject to wearing a neck brace, she was able to care for Henry, and she visited Greyson in the hospital while he recovered. Further, Dozier stated that she provided all of Henry's care during the time that Greyson remained in the hospital. Dozier's father, Tim, corroborated that Dozier provided Henry's care and that he and Dozier's mother helped when Dozier needed assistance.

Weber also testified that Dozier had taken the boys on vacation outside of the state during her parenting time without informing him, including trips to South Dakota, Colorado, and Las Vegas. He stated that he learned of those trips only because a third party sent him screenshots of Dozier's social media posts. Additionally, Weber stated that he only learned of one of the trips after the children's preschool teacher notified him during a parent-teacher conference. Dozier stated that she notified the school regarding the children's absence from school and that she would not be attending that parent-teacher conference. Although Weber admitted that the parenting plan did not include a provision requiring one parent to notify the other when they leave the state, he testified that he believed it was reasonable for co-parents to share that kind of information and Dozier agreed that the parties could be better at sharing such information.

Dozier indicated that some of the parties' disputes were no longer an issue. For example, the parties, who were raised in different churches, had disagreed over what religion the boys should practice. Dozier testified that this was no longer an issue because Weber's new wife was Catholic, the same religion as Dozier, and Weber began attending Catholic church with his family. Additionally, Dozier indicated that the parties had disagreed about when the parties' summer schedule was to begin, but the matter was resolved when they discovered the decree which granted each party their preference in choosing the summer schedule commencement in alternating years.

Both parties also agreed that, on occasion, there have been times when both had been late to exchanges. However, according to Weber, one exchange escalated when Dozier called police when he was late, resulting in the police being present at the exchange location when he arrived. Weber also testified that during one exchange, he got into a physical altercation with the individual that had accompanied Dozier. Although Weber was charged with assault, those charges were eventually dismissed. On another occasion, Weber stated that Dozier pulled the children away from his wife during an exchange; Dozier disputed Weber's account.

### (c) Children's Medical and Dental Appointments

The evidence presented established that both Weber and Dozier took the children to doctor and dental appointments and that the children are up-to-date on their medical and dental appointments.

### (d) Children's Education and Activities

The evidence established that both children were interested in, and involved in, school activities and that both parents were involved in their activities. In the year prior to the modification hearing, the children had been enrolled in kindergarten at Syracuse Elementary School. Weber

testified that the boys were placed in separate classes against his wishes but he did not know whether the school made that determination. Weber testified that a week prior to the trial, Dozier notified him that she had registered the children in school in Bellevue, Nebraska. Dozier disputed this testimony, stating that she had not registered the children for school in Bellevue; instead, Dozier stated that she informed Weber of her intention to move to Papillion, Nebraska, and that the parties needed to discuss the children's school situation.

### (e) Tax Exemption

Weber stated that Dozier did not allow him to claim one child on his taxes as outlined in the decree; however, he admitted that one of the conditions of him being able to claim one child on his taxes was that he was up to date on his child support payments. The evidence established that Weber missed multiple child support payments.

### 3. DISTRICT COURT ORDER

In October 2020, the district court denied Weber's request to modify custody based upon its finding that no material change of circumstances existed. The court determined that Weber failed to prove that Dozier did not provide a stable environment, that she had moved excessively, or that she was an unfit parent. The court found that Dozier's placing of the children with her parents while she worked overnights and the fact that co-parenting between the parties had been difficult was insufficient to warrant a change in custody. Further, although the court acknowledged that the parties had difficulty communicating, the court found that it did not rise to a level requiring a modification.

Although the court found no material change in circumstances existed warranting a change in custody, the court did find that a material change of circumstances existed warranting a modification of child support due to the change in the parties' income as well as a change in family status due to the birth of Weber's other two children. The court awarded Dozier child support in the amount of $587 per month in accordance with a stipulated child support calculation submitted by the parties during the modification hearing.

### 4. MOTION FOR RECONSIDERATION OR TO ALTER OR AMEND

Weber filed a motion for reconsideration or to alter or amend the modification decree. Weber requested the court reconsider the issue of modification of legal and physical custody and, at a minimum, to change the parties' holiday visitation schedule. Weber based his motion on the "friendly parent doctrine," indicating that custody should have been awarded to him as he was the more cooperative parent. He argued that Dozier's credibility came into question during the August 2020 hearing. In that regard, he requested that the court focus on impeachment testimony of Dozier made throughout the hearing and that the court reconsider Dozier's credibility in making its final determination. The court overruled Weber's motion finding that Weber failed to meet his burden of showing that there was a material change in circumstances. Weber has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Weber alleges that the district court erred when it (1) failed to find that a material change in circumstances had occurred, (2) declined to award Weber legal and physical custody of Greyson and Henry, and (3) declined to order Dozier to pay child support to Weber.

## IV. STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *VanSkiver v. VanSkiver,* 303 Neb. 664, 930 N.W.2d 569 (2019); *Weaver v. Weaver,* 308 Neb. 373, 954 N.W.2d 619 (2021). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

In an appeal of an equity action, the court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court. *Weaver v. Weaver, supra*. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id*. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. MATERIAL CHANGE IN CIRCUMSTANCES

We undertake our analysis by addressing the specific reasons argued by Weber which he alleges constitute a material change in circumstances. Weber first suggests that Dozier's change in work, when considered individually or in the aggregate with other considerations, constitutes a material change in circumstances.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). This showing is a two-step process: First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*.

A material change in circumstances is defined as "the occurrence of something which, had it been known to the marital dissolution court at the time of the initial decree, would have persuaded the court to decree differently." *Weaver v. Weaver*, 308 Neb. 373, 391, 954 N.W.2d 619, 632 (2021). When analyzed against that standard, we fail to see how Dozier's employment history would meet that standard.

At the time the original decree was entered awarding Dozier physical custody of the boys, she was studying to be a nurse. Dozier's obtaining of a degree and moving into the workforce, then, would appear to be a natural progression from her status at the time the original decree was

entered. Nor do we view Dozier's consideration of pursuing a position in her chosen occupation in Colorado followed by a final decision to obtain a position more locally in Council Bluffs as a matter that would persuade the original court to decree differently. See *Bohnet v. Bohnet*, 22 Neb. App. 846, 862 N.W.2d 99 (2015) (ordinarily, custody of minor child will not be modified due to intrastate move of custodial parent unless there has been material change of circumstances showing that custodial parent is unfit or that best interests of child require such action). In fact, Dozier's choice appears consistent with themes found throughout this record that she is dedicated to her children and demonstrates fitness in caring for them.

We likewise see no material change in circumstances in the progression of Dozier's relationship with her friend of 9 years which apparently blossomed into a romantic relationship and decision to cohabitate, which Dozier testified would hopefully result in marriage. As opposed to isolating on the issue of cohabitation in general, see *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996) (this court does not generally give weight to parent's relationship or cohabitation with another in custody determinations unless it has some adverse impact on children), we instead are more persuaded by the testimony regarding the nature of Dozier's boyfriend, his relationship with the children, his own apparent stability, and their decision to move to Papillion to best accommodate their work positions, their children, and all involved. Just as Weber's life progressed into a long relationship with a stable environment which meaningfully provides for the children, so too the record suggests of such an evolution for Dozier. In fact, we reiterate the district court's finding that these appear to be two loving, fit parents who care deeply for their children and for which we commend them. In short, we do not see that the district court abused its discretion in finding no material change in circumstances has occurred here in relation to Dozier's relationship, her career, or choice for her home.

Nor do we see Dozier's utilization of her parents' assistance while she works her three overnight shifts as constituting a material change. Again, in connection with that specific situation, the record indicates Dozier's parents provide support during her overnight nursing shifts, most of which time is spent while the children are sleeping, but is highlighted by Dozier's care and support in connection with that arrangement. Specifically, the record shows in connection with this arrangement, Dozier provides breakfast in the morning and takes the children to school on the days she does not work overnights. Dozier's mother works at the school as a secretary and provides transportation on the days that Dozier does work. Dozier picks up the children from school every day. On nights she does not work, Dozier indicated that they all spend time together playing games or watching movies after dinner. Tim indicated that he and his wife watch the children when Dozier works between two and three nights a week, and that they help as much as they can. He indicated that he has witnessed interactions between Dozier and the children and stated that they have a positive relationship. And the record indicates that role will now be shared by Dozier's boyfriend who the record reflects is kind and nurturing to the children. The reality is that working parents have to make certain accommodations in order to provide for themselves and their children. We fail to see anything in this arrangement which suggests of any level of unfitness or circumstance which would warrant a change in custody.

Perhaps our greatest concern here lies in the parents' ability to communicate with each other. Certainly the record consists of testimony where the parents accused each other of failing to

communicate in a civil manner. Examples include allegations of not communicating when a parent leaves town, changing living arrangements without notice, failure to communicate about changes in the children's activities when both parents desire to remain involved in their children's lives, uncivil exchanges with each other or with acquaintances of either parent whether in front of the children or not, calling the police upon a late arrival to an exchange, and other instances described in the record. These instances are most assuredly inconsistent with the levels of civility requested by courts and can have an adverse impact on the children whom both parents profess to love. But in reviewing that testimony, we found conflict in the positions of the parties, found instances where both have failed in their communications with each other, and will give deference here to the trial court judge who heard and observed the witnesses and accepted one version of the facts over another. See *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). Notwithstanding the communication failings described here, there was also some indication in the record of progress being made between the parties and indications of a willingness to progress in that area. As such, we cannot say on this record that the court abused its discretion in failing to find Dozier's alleged communication failings rose to a level of a material change in circumstances.

We hold that when considered individually or in the aggregate, the district court did not abuse its discretion in finding the circumstances alleged here did not amount to a material change in circumstances warranting a change in custody and remain most hopeful that the parents' love for their children will result in continued progress in their communications and dealing with each other as they continue to raise their children.

### 2. CUSTODY

Weber next contends that the district court abused its discretion in failing to award him legal and physical custody of the parties' two children.

Only after the court makes a finding that there is a material change in circumstances can the court then modify the custody order already in place. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). If the court finds, on the other hand, that there is no change of circumstances, the court may not modify the custody arrangement. *Id*. A finding by the court of such a nature will not be reversed unless it was an abuse of discretion. *Id*.

As set forth above, because we find no error in the court's determination that no material change in circumstances existed, we likewise find that the district court did not err in declining to modify the custody award. This assigned error fails.

### 3. CHILD SUPPORT

Weber further contends that the district court erred in refusing to order Dozier to pay child support. Weber's argument is based upon his claim that the district court erred in failing to award him sole legal and physical custody of the parties' minor children.

Modification of an award of child support is not justified unless the applicant proves that a material change in circumstances has occurred since entry of the decree or a previous modification.

*Lodden v. Lodden,* 243 Neb. 14, 497 N.W.2d 59 (1993). The ultimate concern for a modification is the best interests of the child. *Id.*

Having previously determined that the district court did not abuse its discretion in finding that no material change in circumstances existed to modify custody, it follows that the district court did not err in declining to modify child support based upon a change in custody. We further note that the district court set Weber's child support obligation in accordance with the parties' stipulation and the Nebraska Child Support Guidelines. This assigned error fails.

## VI. CONCLUSION

For the above stated reasons, we find that the district court did not abuse its discretion in determining that no material change in circumstances existed to modify custody and in declining to award Weber child support based upon a change in custody. Accordingly, we affirm.

AFFIRMED.