IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BRYAN V. BRYAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SARAH K. BRYAN, APPELLEE,

V.

DAVID A. BRYAN, APPELLANT.

Filed August 30, 2022.    No. A-21-831.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

John A. Kinney, Jill M. Mason, and Samantha M. Robb, of Kinney Mason, P.C., L.L.O., for appellant.

Andrea Finegan McChesney, of M|F Law Omaha, for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

David A. Bryan appeals from the decree entered by the Washington County District Court dissolving his marriage to Sarah K. Bryan, dividing the parties' marital estate, awarding legal and physical custody of the parties' children to Sarah, and ordering David to pay child support. David disputes the custody and child support award, with his primary complaint being that the district court should have followed the children's guardian ad litem's (GAL) recommendation for joint physical custody, which was largely consistent with a parenting plan previously mediated by the parties. However, Sarah presented evidence at trial about ongoing conflicts between the parties which warranted reconsideration of whether joint custody remained a viable arrangement when considering the best interests of the children. The court acknowledged the GAL's "very thorough report," but disagreed with the recommendation for joint legal and physical custody. The court issued a detailed opinion explaining its decision, which is supported by our de novo review of the

evidence. And since our standard of review is limited to whether the trial court abused its discretion, we affirm.

## II. BACKGROUND

David and Sarah were married in Nebraska in October 2004. The parties have four children: three sons, born in 2007, 2015, and 2019, and one daughter, born in 2010.

On March 9, 2020, Sarah filed a complaint for dissolution of marriage requesting temporary and permanent custody of the parties' children, child support, alimony, an equitable distribution of the marital property and debts, and attorney fees. In his answer and "[c]ounter [c]omplaint" filed on March 12, David sought an award of the same in his favor. David also filed a motion for temporary custody and child support, among other requests.

In April 2020, the district court awarded the temporary legal and physical custody of the children to Sarah. David was to have four overnight parenting days each week when he was in Nebraska for his work breaks; when traveling for work, he was allowed to video call the children every other day (this was based on his work schedule where he traveled for 6 weeks and then had 2 weeks off). David was ordered to pay temporary child support in the amount of $891 per month for the parties' four children.

In August 2020, the district court entered an order allowing David, who had been furloughed from his job, to have parenting time every other week from Thursday at 4 p.m. until Sunday at 4 p.m.

In November 2020, David filed a motion for further temporary orders stating that the parties had mediated a parenting plan on September 3 wherein the parties would share joint legal and physical custody of the children; regular parenting time would be equally divided, with one parent having two consecutive nights, followed by the other parent having two consecutive nights, and then alternating the next three consecutive weekend nights (hereafter "two-two-three" schedule). David requested that the existing temporary order be modified to conform to the mediated parenting plan pending trial. He also asked that his child support be suspended until trial due to the joint physical custody schedule. At a hearing in December, counsel for the parties stated that earlier that month, the parties began exercising a "50/50" parenting time schedule, similar to what was in the mediated plan, but with different days. The district court granted the motion and directed David's counsel to prepare an order confirming the parenting plan as agreed to by the parties earlier in December, and to suspend David's child support obligation beginning February 1, 2021. No written order appears in our record on appeal.

In March 2021, upon Sarah's motion, the district court appointed a GAL for the children.

Trial was held on May 26 and July 15, 2021. Several witnesses testified and numerous exhibits were received into evidence. The evidence will be summarized as relevant to the issues on appeal later in our analysis.

In its decree entered on September 17, 2021, the district court dissolved the parties' marriage, divided the parties' marital estate, and ordered David to pay Sarah alimony in the amount of $200 per month for 12 months. As relevant to this appeal, the court awarded the legal and physical custody of the children to Sarah. Pursuant to the court's parenting plan, David was to have parenting time with the children every other weekend from 6 p.m. on Friday until 6 p.m. on Sunday, and every Wednesday from 4 p.m. to 7:30 p.m. During the summers, David was to have

4 weeks of parenting time with no more than 2 continuous weeks; each parent was to have a period of at least 10 continuous and uninterrupted days of parenting time during the summer. A holiday parenting time schedule was also established. David was ordered to pay child support in the amount of $841 per month for the parties' four children, beginning October 1. He was also ordered to pay 50 percent of any childcare costs due to Sarah's education or employment, and 50 percent of any out-of-pocket medical expenses for the children.

David appeals.

## III. ASSIGNMENTS OF ERROR

David assigns that the district court erred in (1) awarding Sarah sole legal and physical custody of the parties' children, and (2) calculating child support because it was based on an award of sole physical custody.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. CUSTODY

David claims that instead of awarding Sarah sole custody of the children, the district court should have awarded the parties joint custody.

### (a) Legal Principles

Under the Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2020), the concept of child custody encompasses both "legal custody and physical custody." § 43-2922(7). "Legal custody" means the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health. § 43-2922(13). "Physical custody" means authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time. § 43-2922(20).

When deciding custody issues, the court's paramount concern is the child's best interests. *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). Section 43-2923(6) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Smith v. King, supra*.

## (b) Trial Evidence

Sarah testified that she was living in the marital home with her children and her grandmother. Sarah was working as a nurse assistant at a hospital on a "PRN, or casual" basis, and was working toward her Bachelor of Science degree in nursing--she had two more semesters left at the time of trial and was scheduled to graduate in May 2022. During the marriage, Sarah was a stay-at-home mother and the primary caregiver to the parties' four children; she was also involved with some of David's entrepreneurial ventures throughout the years.

Sarah stated that during her marriage to David, he was abusive, "physically, emotionally, [and] spiritually"; "He abuses as an act of power to subjugate the person." She said she lacked confidence in her ability to act because she did not know if she would be in trouble if she did something. He raised his voice to her, belittled her, degraded her, and responded angrily to her; at times, this was done in front of the children. Sarah said she "was never allowed to make decisions" and David would tell her about his decisions after the fact. When she suggested therapy, David declined because he said he would lose his job.

Sarah stated that in February 2020, David provided her with a plan for how he would change his behavior. Exhibit 38, David's "Plan for Changing [his] Behavior and Attitudes Towards [his] Wife and Children: Becoming More Responsible, Mature, and Non-Abusive," was a four-page document that included statements such as the following. "If I do not understand [Sarah's] point of view, rather than belittling her and/or trying to change the subject, I will write down the points she is making and spend some time internalizing them. When I answer her it will be in a thoughtful and fair way with no put-downs or insults." "I will no longer retaliate or get even with Sarah when she does something or brings up a subject that I do not like." "I will show forth an increase of love to my children by not belittling them when they make mistakes, but instead give them words of encouragement." Regarding exhibit 38, David testified that he "was trying to save [his] marriage at the time" and "[he] would write anything that [he] could to help convince her that she was making a big mistake"; he denied that he spoke negatively about Sarah or belittled his children.

- 4 -

Sarah filed for divorce in March 2020. David testified that at the time the divorce was filed, he worked as a survey pilot, and his schedule had him away from home for 6 or 8 weeks at a time and then home for 2 weeks. Pursuant to the April temporary order, Sarah was granted full legal and physical custody of the children, with David having parenting time for 4 nights each of the 2 weeks that he was in Nebraska (David's parenting time was based on his work schedule as a pilot). David testified that he was furloughed from his pilot job on June 1 and began working full time for Shipt. At the time of trial, he was still working for Shipt, doing personal shopping and grocery service; he made his own schedule, which was flexible. He was no longer employed as a survey pilot.

In September 2020, Sarah and David mediated a parenting plan, exhibit 35, wherein the parties would have joint legal and physical custody with a two-two-three schedule. That was generally the custody arrangement the parties exercised from December until trial.

According to Sarah, ever since she filed for divorce in March 2020, communication with David had been "[t]errible." She asked David that they communicate in writing (text or email) and limit it to discussing the children. Sarah said that she tried to relay information about the children to David as soon as she had the information, but he did not do the same. When asked how the mediated plan was working, Sarah responded, "It hasn't been working very well because of the lack of communication"; David will either not respond or will respond by telling her that she is "'unbelievable.'" The lack of communication was why Sarah was asking the district court to award her legal custody of the children.

David stated that he and Sarah did not need to communicate "about much at all"; they needed to talk about the children "[w]hen it's necessary." He said that in addition to text messages and email, Sarah tried to communicate with him during parenting time exchanges, but that she was "not supposed to be talking to [him] during child drop offs and pick ups." (The parties' mediated parenting plan stated that the parents would communicate via texts, emails and telephone calls. It also stated that they would not hold any discussions during parenting time exchanges or in the presence of their children.) David was "agitated" when Sarah tried to discuss their daughter's medical issue with him during a parenting time exchange the week of trial; he did not respond to her email from the day before about the medical issue because he was working, but he acknowledged seeing the email. (The mediated parenting plan stated that a responding parent should acknowledge receipt of a text within 24 hours in order to make decisions for the children more efficiently.) According to David, the conversation about their daughter's medical issue happened outside the presence of the children.

Sarah stated that she had difficulties contacting the children while they were with David. She would text him to say she wanted to talk to the children, but he always had a reason why she could not talk with them or he would just tell her no. David testified that if Sarah tried to contact the children during his parenting time and they were busy, he let them know they should call her, but he left it up to the children to determine whether or not they wanted to talk to Sarah.

Sarah testified that after the children had parenting time with David, she would ask them something like, "[H]ey, how was your time with your dad?" According to Sarah, the children did not always feel comfortable going to David with their concerns. On the two times that she could tell the children were really upset, she told the children she was going to record the conversation because "I felt that it was better coming directly from them instead of it being biased by me or

hearsay by me, and I certainly didn't try to do anything that was misleading to the Court." Sarah said the recordings were made due to "what I felt was their serious concerns about some of the treatment that they experience at their dad's house." The recordings were not offered or received into evidence. However, Sarah stated that the first incident was about David shoving their middle son out of the way so that David could clean up a water mess. Sarah also had concerns about David calling their daughter a brat.

Another issue between the parties was their children's education; the children were being homeschooled. David testified that he initially supported the decision to homeschool the children "[b]ecause there was a commitment made by Sarah to do that, to teach the children, to make herself available for them, to make sure that it was done properly"; she did that for several years during which time he was on board with homeschooling. However, with Sarah working and going to school, Sarah's mother did the homeschooling "most of the time" and David's parents helped when he had the children. David did not believe that it was the grandparents' responsibility to homeschool the parties' children. Also, according to David, with the homeschool schedule set by Sarah, "[the children] don't spend enough time learning"; "they may only cover one subject once in the week, like history or social studies or even language arts once a week, and it's not enough for retention." When asked how he knew there was poor retention, David replied, "Because when we sit down with them to go over their next lesson and, of course, the next lesson such as in math, math is built upon what you learned in the previous lesson," "they can't do it because they don't understand the principles that they were just taught a couple of days ago." David wanted the children to go to public school because "it would be very good for their education."

Sarah did not agree with sending the children to public school. She said the children were thriving with homeschooling, particularly their daughter who, according to Sarah, was working ahead of grade level; Sarah's assessment was based on the workbooks the daughter had completed. The children had not taken any standardized testing similar to what is utilized in public school because, according to Sarah, the State Board of Education did not offer standardized testing to homeschool students until high school. David did not agree with Sarah's testimony that the children were doing well in their homeschooling. He testified that when he looked at the children's work he was "not impressed with it." He "[felt] that their education right now [was] severely lacking" and he did not believe that the children were at the same level that they would be if they had been in a public school.

Kjestine Evans, Sarah's mother, testified that she had assisted with homeschooling the children for several years; Sarah gave Evans the curriculum and then Evans helped make up the schedules and also taught certain subjects. Evans observed both parents with the children during the marriage. She said she "found [David], especially with the two eldest children, to be very terse and short, short of patience" and he was "overly favoring" with the middle son. Evans observed Sarah to be "the primary caregiver," the one who made sure the children had food and clothing, and the one who made sure they had their schoolbooks and their curriculum planned out.

Steven Bryan, David's father, testified that David had lived with Steven and his wife since March 2020; the parties' children also lived in Steven's home during David's parenting time. Steven believed that David had a "very good relationship" with the children and they enjoyed doing things together. Steven stated that David was "an honorable man" who "loves his family." Steven also stated that the children loved Sarah.

Steven testified that when David was working, the youngest child went to daycare and Steven and his wife provided care for the other children; otherwise, David provided the care for the children. David testified that the parties' youngest child went to daycare three times every 2 weeks. David did not discuss daycare with Sarah because "[i]t's none of her business." David acknowledged that Sarah told him that she would prefer that her mother or grandmother watch the child rather than putting the child in daycare, but David did not believe it was their responsibility.

Sarah's proposed parenting plan, exhibit 56, indicated that Sarah would have sole legal and physical custody of the children. David would have regular parenting time every other weekend from Thursday at 7 p.m. until Sunday at 7 p.m. Sarah believed that her proposed plan would be in the children's best interest because

> during [David's] parenting time, often . . . the kids are elsewhere, spending the night at cousins' houses. He has said that he has a flexible work schedule, but he puts the baby into daycare, he's not taking care of the kids, his mom is doing the homeschooling, he's working, which is fine, but the reality is he's not adjusting his schedule to make sure that he is there with the kids, enjoying time with the kids.

David, on the other hand, testified that the parties' two-two-three parenting time schedule "works really well" and that keeping that schedule in place would be in the children's best interests. He wanted the district court to adopt the mediated plan, exhibit 35, as amended by exhibit 58 (parties' actual regular parenting time days with the 3-day portion being Thursday at 7 p.m. through Sunday at 7 p.m.); he was also agreeable to the "static" schedule recommended by the GAL, as discussed below. Most important to David was that the children spend an equal amount of time with both parents. David confirmed that he was willing to set aside his personal differences with Sarah for the best interests of their children.

David wanted the parties to have joint legal custody, even though they could not agree on the children's education. He said that he and Sarah did not have any disputes about the children's religious upbringing, health care, or medical treatment. David was asked if he would include Sarah in the decisionmaking process for the children should the district court award him sole custody; he said he would. However, David did not believe that Sarah would include him in the decisionmaking process if she was awarded sole custody because "she doesn't care if I have a part in my kids' upbringing." David thought that the parties currently had poor communication, but that the best way for the parties to communicate with each other in the future would be to use the parenting application recommended by the GAL.

The children's GAL testified that she reviewed the pleadings, spoke with Sarah and David, met with the children at both parents' houses, and spoke with both Sarah's mother and David's mother. The GAL observed no safety issues in Sarah's home or David's home (which was David's parents' home; David was living with his parents). The GAL's report was received into evidence. According to the GAL, neither parent was unfit.

The GAL discussed that the children were doing a two-two-three schedule with their parents. The parties' oldest son told the GAL he liked spending time with both of his parents and felt like he had enough time with each parent; however, he did not like the "flip-flop" schedule and that he did not have a consistent schedule during the week. The parties' daughter told the GAL that she wanted to spend more time with Sarah, and that she wanted to have parenting time with

David on alternating weekends. The GAL did not speak to the youngest two children regarding their preferences.

The GAL stated that Sarah and David had different thoughts on what homeschool should look like. David told the GAL that during the marriage, Sarah did the homeschooling, was committed to it, and was good at it; however, when she went back to work, homeschooling became a job for the grandparents and there were miscommunications and inconsistencies in scheduling. At David's house, the children had a full school day before they were allowed to play, but David did not believe that was the schedule at Sarah's house. Sarah told the GAL that she thought the children were doing well, and that they were probably exceeding children in public schools. When Sarah was at work, her mother helped her homeschool. According to the GAL, the oldest two children reported that they enjoyed homeschooling; at Sarah's house, Sarah's mother helped with homeschooling, and at David's house, his parents and his sister helped with homeschooling.

The GAL was concerned that both parents included the children in adult matters. For example, the GAL was concerned about Sarah's communications with the children after visits with David; sometimes after visits, Sarah and the children would read a book called "When Dad Hurts Mom." When the GAL spoke with the parties' daughter, the daughter said the book helped her "'to identify signs of abuse'"; when the GAL asked the daughter if there was abuse at David's house, she said "'not yet.'" But, according to the GAL, "it seems like [the daughter is] kind of on alert" and "looking for something to report back [to Sarah]." The GAL did not believe there was abuse in David's house. Sarah testified that she got the book from a group therapy that she had attended, and she thought parts of a specific chapter might be helpful to the children. Sarah said the book was "not specifically targeting anything to do with [David], other than [the children were] upset at the various situations [(conflict with their father)] and trying to make heads or tails of it." She said, "I kept it very filtered as I went along. They did not get a verbatim read of the book and we only looked at it two, maybe three times." According to Sarah, her daughter was only present one of those times, and the other time "[the oldest son] asked after the kids went to bed" if they could "read from that book again because he found it comforting and beneficial."

As another example, the GAL was concerned after David mentioned that the children wrote affidavits against him and that he asked them if they really felt that way; the GAL did not believe that the children should be involved in the court process. Both parents involved their children in the divorce, but "mom a little bit more than dad." The GAL stated that "these children need their parents to parent and they need to be kids."

The GAL was also concerned because it was apparent during conversations with both Sarah and David that they did not communicate well during pick ups and drop offs, and did not communicate well in general. The GAL believed Sarah received information about what went on at David's house directly from the children, which put the children in a difficult position. And Sarah told the GAL that during parenting time exchanges, David had yelled at her in front of the children and "flipped her off or her parents off"; David told the GAL that Sarah's parents were present during parenting time exchanges and would overstep and cause tension between the parties.

During his testimony, David denied ever yelling at Sarah in the past and denied yelling at her in front of the children. When asked if Sarah was just making that up, David responded, "Yes." After being directed to the GAL report that stated the parties' daughter said she heard her father

scream at her mom, David was asked if the daughter was lying to the GAL. David replied, "Possibly, or she said what she heard her mother say."

The GAL's understanding was that, prior to the divorce, Sarah had been the children's primary caregiver and educator; David's bond with the children was not as strong as Sarah's bond with them. The GAL believed that joint physical custody was appropriate, but "the issues between [Sarah and David] gets the children involved and that's where the issues lay." The GAL believed that the parenting plan should "[k]ind of" remain a two-two-three schedule, but "the two-two should remain standing days." She explained, stating, "[Sarah] would have Monday-Tuesday, [David] would have Wednesday-Thursday, the parties would alternate the weekend, so I guess it's more five-two"; this would allow the children to have some more consistency. The GAL suggested the "My Family Wizard" application which would allow the parties to communicate about school, medical appointments, and extracurricular activities.

### (c) Did District Court Abuse Its Discretion?

### (i) Legal Custody

The district court found that neither party was unfit, "However, both parties, in their written closing submissions to the Court, generally agree that joint legal custody will not work." The court agreed that the parties have had difficulty coparenting and ongoing disagreements regarding primarily the education of the children, thus an award of joint legal custody was not appropriate. The court found that joint legal custody was not in the best interests of the children. The court said it would then consider "to whom legal custody should be awarded," but it proceeded to consider both legal and physical custody together under a heading entitled "Best Interest."

Pertinent to legal custody, the district court found that Sarah had been the primary caretaker of the children during the marriage and "to a great extent throughout the pendency of this matter." The court also considered the parties' poor communication, and more specifically David's "cavalier attitude" toward communication. The court noted David's statement that the parties did not "need to communicate much at all"; his history of informing Sarah of decisions after the fact rather than discussing matters with her; his failure to respond to an email about the daughter's medical issue and then getting "agitated" with Sarah when she tried to discuss the matter at a parenting time exchange; and his failure to tell Sarah about the youngest child's daycare arrangement because it was "none of her business." Additionally, while the parties both initially agreed the children should be homeschooled, they were no longer in agreement at the time of trial.

Courts typically do not award joint legal custody when the parties are unable to communicate effectively. *Lasu v. Lasu*, 28 Neb. App. 478, 944 N.W.2d 773 (2020). See, also, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another).

However, joint custody has been granted and upheld on appeal even in instances where the evidence demonstrates a lack of communication or cooperation between parents. See, *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015) (joint legal custody

maintained despite apparent inability of parties to parent cooperatively with one another); *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004) (district court's award of joint legal custody affirmed despite difficult communications between parties). However, the key to such cases on appeal is the "appellate court's deference to the trial judge who had heard and observed the witnesses." *Bornhorst v. Bornhorst*, 28 Neb. App. 182, 195, 941 N.W.2d 769, 780 (2020). Having reviewed the record, and giving deference to the district court's observations of the witnesses, we find no abuse of discretion in its decision to award legal custody of the children to Sarah.

### (ii) Physical Custody

David suggests that there was no indication at trial that Sarah "was contesting her prior agreement to joint *physical* custody." Brief for appellant at 21 (emphasis in original). "The lion's share of Sarah's evidence concerned legal custody issues." *Id*. David claims that any "poor communication" between the parties was a legal custody issue "for the most part." *Id*. at 22.

David directs us to *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019), where joint physical custody was upheld despite communication issues between the parents. In that case, the Nebraska Supreme Court observed that the Parenting Act provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance, and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. See *State on behalf of Kaaden S. v. Jeffery T., supra*. Regarding the apportionment of parenting time between parents, the court stated:

> [W]hen making determinations as to the allocation of parenting time that is in a child's best interests, a trial court should also consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. The fact that one parent might interfere with the other's relationship with the child is also a factor to consider, but is not a determinative factor.

*Id*. at 957, 932 N.W.2d at 710.

Further, not each factor will be relevant in every case, nor is a court prohibited from considering other factors not mentioned. See *id*. "No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case." *Id*.

Notably, the Nebraska Supreme Court stated:

> [W]hether parents come to court having agreed to a joint custody arrangement, or disputing the issues of custody and parenting time, the court is required to independently determine that any parenting plan being ordered is in the child's best interests and must reject or modify parenting plans that are not in the child's best interests or which do not meet the requirements of the Parenting Act.

*Id*. at 955, 932 N.W.2d at 709.

In this case, the district court thoroughly considered relevant factors before making its own independent decision on physical custody and allocation of parenting time. The court's decision was based upon the best interests of the children, as it was required to do, regardless of any preexisting or recommended parenting plan. See *State on behalf of Kaaden S. v. Jeffery T., supra*. The court initially considered that Sarah had been the primary caretaker of the children, as she had been a stay-at-home mother throughout most of the marriage and had also homeschooled the children. And Sarah was "still was the primary person to arrange for the care of the children" even though she was currently working part time and enrolled as a nursing student. However, this was not a determinative factor, and it is evident the court weighed more heavily the evidence of David's attitudes and behaviors.

The district court provided numerous examples regarding the poor communication between the parties, such as: David testifying about there being nothing to talk about with Sarah since there was not going to be a marriage any longer; David making "major changes" in employment that had a "significant impact on the family" without discussing such changes with Sarah in advance, and instead, David "would merely tell her about them after the fact"; David testifying about being agitated and upset by Sarah's emails about their daughter's emergency room visit because of a rash that developed after an insect bite since he felt Sarah was not supposed to speak with him about anything; and David not telling Sarah about his use of daycare for their youngest child because it was "'none of her business.'" The court found David's "cavalier attitude" about communication between himself and Sarah "to have been prevalent throughout the marriage" and that it "affects the best interest[s] of the children."

The district court pointed out that David's prior employment as an airline pilot took him away from home for 6 weeks at a time, and that David "entrusted the health and welfare, social behavior and education of the children" to Sarah.

When considering physical and mental abuse under Neb. Rev. Stat. § 43-2932 (Reissue 2016), the district court noted that the statute was "designed to protect a child and/or a child's parent from potential harm by the other parent as a result of the other parent's past harmful conduct." It found that throughout the marriage, David "controlled the financial decisions of the parties with little or no consultation" with Sarah, and when Sarah "would try to discuss important issues" with David, "he would shut it down through verbal retaliation." The court referred to Sarah's testimony about David "belittling the children and being aggressive or insensitive to their needs." To that point, the court quoted from David's February 2020 email that detailed David's "plan for changing his behavior and attitudes towards his wife and his children." The court found that while the letter acknowledged David's deficiencies to his family "and that he was going to change, his actions during the pendency of the divorce would suggest that he has not followed through with his plan." The court found there "has been some level of mental abuse inflicted by [David] upon [Sarah] and the children," a factor that weighed in favor of physical custody to Sarah. However, the court found that the children were not currently endangered by David and that supervised parenting time was not necessary "at this time." The court also referenced the two oldest children's statements to the GAL regarding custody and parenting time, and other relevant statements by the children.

The district court further found that Sarah was "more stable and organized than [David] in her education, employment selections, and general care of the household and the children."

Although the GAL opined that a two-two-three parenting plan was in the best interests of the children, the district court disagreed. The court indicated that the GAL had done a "thorough investigation," and that the court "carefully listened to the testimony of both parties as well as the testimony of the [GAL]." It also pointed out that "[b]oth parents have unnecessarily involved the children in these divorce proceedings and, as noted by the [GAL], '. . . both have a lot of work to do when it comes to coparenting.'" The court stated that David's lack of communication with Sarah, especially regarding the children, "is extremely troubling." It found that Sarah "was a more credible witness in regard to the issues of their relationship as well as the relationship between the children and both [Sarah] and [David]." The court found that it was in the children's best interests "that their sole care, custody, and control be awarded to [Sarah] subject to the reasonable and liberal parenting time with [David]."

David largely takes issue with the district court's view of the evidence and its award of sole physical custody to Sarah. David points to the fact that the parties had a mediated parenting plan that they followed from December 2020 until the time of trial, and that the GAL recommended joint physical custody. Although there was some question in earlier hearings as to whether the mediated parenting plan was intended for temporary or permanent purposes, it was clear from Sarah's trial testimony that the mediated parenting plan was not working. And, as discussed above, it was the court's responsibility to consider whether the mediated parenting plan was still in the best interests of the children in light of the evidence presented at trial. As for the GAL's recommendation, David acknowledges in his own brief that the district court was not required to give the GAL's testimony any more or any less weight than the testimony of other witnesses. See *Beran v. Beran*, 234 Neb. 296, 300, 450 N.W.2d 688, 691 (1990) (district court not required to give guardian ad litem's testimony "any more or any less weight than the testimony of other witnesses"). Further, when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017).

Having reviewed the record de novo, we find the district court's rationalization for its decision, as set forth above, to be supported by the evidence. Further, the district court's specific finding that Sarah was a more credible witness regarding relationship issues involving herself, David, and the children, is a significant factor in this court's review of any conflicting evidence. Accordingly, we cannot say the district court abused its discretion by awarding physical custody of the parties' children to Sarah, subject to David's parenting time as set forth in the court's parenting plan.

## 2. CHILD SUPPORT

David argues that "[s]hould this Court find that the trial court erred in awarding Sarah sole physical custody, a recalculation of child support must be completed to order child support in accordance with a worksheet three, joint physical custody analysis." Brief for appellant at 25. Because we have found that the district court did not abuse its discretion by awarding physical custody to Sarah, no recalculation of child support is necessary.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's September 17, 2021, decree of dissolution.

AFFIRMED.