Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/20/2026 08:08 AM CDT

JENNIFER M. PROSOSKI, APPELLEE AND
CROSS-APPELLANT, V. JASON C. REGAN,
APPELLANT AND CROSS-APPELLEE.

___ N.W.3d ___

Filed March 20, 2026.    No. S-25-295.

1. **Rules of the Supreme Court: Appeal and Error.** Where a brief of a party fails to comply with the mandate of Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2025), an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error.

2. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

3. **Divorce: Property Division.** The extent to which the property is marital versus nonmarital presents a mixed issue of law and fact.

4. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Expert Witnesses.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

6. **Appeal and Error.** Appellate courts do not generally consider arguments and theories raised for the first time on appeal.

7. **Disciplinary Proceedings: Intent.** Proof of actual intent to deceive or defraud is not required to demonstrate an attorney engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. Instead, the focus of the inquiry is on the effect of the lawyer's conduct.

8. **Rules of the Supreme Court: Disciplinary Proceedings: Attorneys at Law.** Acts or omissions by members of the Nebraska bar which violate the Nebraska Rules of Professional Conduct are grounds for discipline.
9. **Divorce: Property Division.** Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.
10. ____: ____. Appreciation, be it active or passive, in the marital interest is always marital; it is simply part of the marital property.
11. **Divorce: Property Division: Equity.** Premarital equity in real property is a nonmarital asset which, if established, should be set aside as separate property.
12. **Divorce: Property Division: Proof.** The burden of proof rests with the party claiming that the property is nonmarital.
13. **Proof.** A fact finder cannot reach conclusions based on guess, speculation, or conjecture, because conjecture, speculation, or choice of quantitative possibilities are, of course, not proof.

Appeal from the District Court for Douglas County: Tressa M. Alioth, Judge. Affirmed in part, and in part dismissed.

W. Gregory Lake, of Plains Legal Group, for appellant.

Benjamin M. Belmont and Mariah E. Shaffer, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

Michael T. Hilgers, Attorney General, Cody S. Barnett, Zachary B. Pohlman, and Katelyn (Miller) Rich, Senior Certified Law Student, for amicus curiae Attorney General.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Per Curiam.

## INTRODUCTION

We moved this appeal of a decree of dissolution of marriage to our docket to address numerous nonexistent or inaccurate case citations and quotations in the appellant's brief, which the appellee/cross-appellant asserts are the product of generative artificial intelligence (AI). The appellee/cross-appellant moved to strike the appellant's brief and dismiss

the appeal. The appellant moved for leave to replace the original brief. We initially overruled each motion. We now strike the appellant's brief, dismiss the appellant's appeal, and refer the appellant's counsel to the Counsel for Discipline of the Nebraska Supreme Court. Finding no merit to the cross-appeal, we affirm the judgment of the district court.

## BACKGROUND

### Factual and Procedural Background

Jennifer M. Prososki (Jennifer) and Jason C. Regan (Jason) were married in 2012. The couple had one child, born in 2014. They have been informally separated since 2016, although they were briefly separated in 2013 and were briefly together from time to time after 2016. The present dissolution action was filed by Jennifer in January 2023. Prior complaints for dissolution were filed in 2013 and 2016 but were later dismissed.

In her complaint for dissolution, Jennifer sought joint legal custody of the minor child, sole physical custody of the minor child, an award for child support, and an equitable division of marital assets. During the pendency of the proceedings, the district court issued two temporary orders related to parenting time of the minor child. The parties also went through several discovery disputes, involving a deposition of Jennifer's daughter from a previous marriage, Jason's attempt to strike one of Jennifer's expert witnesses, and Jason's moving for sanctions against Jennifer and her counsel for alleged discovery violations. The trial did not take place until 2025, after which the decree of dissolution was entered.

At trial, Jennifer's counsel argued that 2016 should be the effective date of division of the assets; thus, the timeframe for "looking at dividing assets that were acquired through the joint efforts of the parties" was between 2012 and 2016. Jason's counsel did not dispute this premise. Jennifer testified that since 2016, she and Jason had not acquired any assets nor incurred any debts through their joint efforts. Jason testified that since 2016, he and Jennifer did not have any joint bank

accounts or joint debt. Jennifer's counsel reiterated after trial that a property division date of August 2016 was appropriate because there were no assets or debts acquired through the joint efforts of the parties after that date.

Jennifer and Jason each own real property that they purchased before the marriage. Jennifer purchased a house in 2008 from Jason. Jason owns a duplex next door to Jennifer, which he purchased in 2005.

Jennifer purchased her house in 2008 for $100,000. Jennifer called an expert witness, a licensed real estate appraiser, to establish retrospective appraisals of her house. The appraiser testified that the appraised value of the house at the time the parties were married in 2012 was $85,000 and that the appraised value of the house in 2016 was $100,000.

A mortgage statement from January 2012 demonstrated the outstanding mortgage on Jennifer's house was approximately $91,600 at the time of marriage. A mortgage statement from August 2016 demonstrated the outstanding balance was approximately $74,500 at the time of their informal separation. Thus, during the period of the marriage before the informal separation, the mortgage balance was reduced by approximately $17,000. Jennifer indicated that Jason did not contribute to the mortgage payments or taxes on the house after 2016.

Jason testified that he purchased his duplex for approximately $143,000 in 2005. Neither party provided expert appraisal testimony regarding any past or present values of the duplex.

Jason testified he believed the duplex was valued about the same when he and Jennifer were married in 2012, as well as when they separated in 2016. However, Jason later testified he did not have a clear opinion of the value of the duplex in 2016. Jennifer testified that, based on comparable sales and per-square-footage pricing information she obtained online, she estimated the value of Jason's duplex at the time of their separation in 2016 to be $169,012. Jennifer could not provide comparable sales information at trial. She could not remember

any details about the comparable sales, such as square footage or number of bedrooms. She admitted she did not have any specialized training in real estate or appraisals. Neither party provided any information as to the extent the duplex was encumbered before their separation in 2016 or as to the mortgage payments made during that period.

At a hearing on Jason's counsel's motions for sanctions and to strike, Jennifer's counsel pointed out that Jason never produced mortgage statements from 2012 and 2016, as per Jennifer's requests for production. However, Jennifer never sought enforcement of her discovery requests and did not seek sanctions or other actions for Jason's failure to produce these documents.

At trial, the court sustained Jennifer's counsel's foundation objection to Jason's counsel's attempts to adduce Jason's testimony as to what his duplex was appraised for in 2023. However, Jason was permitted to testify that he believed the value of the duplex in 2023 was $165,080. Jason had specialized training in real estate but, at the time of trial, was no longer a certified appraiser. Jason testified in his pretrial deposition that he believed the duplex was worth around $160,000 when Jennifer filed for dissolution in 2023. Jason also testified in his deposition that he had to take out a home equity loan in 2023 to pay his counsel and that an appraisal associated with the loan valued the duplex at $245,000. An exhibit entered in evidence reflects an appraisal report in 2021, which was for purposes of refinancing, valuing the duplex at $260,000. The document states that the appraisal was for the purpose of "mortgage financing only." Jennifer testified that Jason did extensive remodeling of the duplex after they separated in 2016. Jason testified in his deposition that he had spent about $55,000 remodeling the duplex after their separation.

Jason testified at trial that, as of the date of filing, he still owed $97,279.36 on his first mortgage on the duplex. A mortgage statement entered in evidence also reflects that balance.

Jason testified he took out a second mortgage on the duplex to pay attorney fees.

The district court set forth in its decree that each party owned their own real estate and shall be awarded the real estate currently in their possession free and clear of any interest from the other party and shall hold the other free and harmless from any and all liability for debts maintained or titled in his or her own individual name associated with the real estate. The court did not order any equalization payment in relation to the real estate.

In a subsequent order on a motion to alter or amend the decree, the court observed that the marital estate consisted of the motor vehicles owned at the time of separation and did not include the real estate. The court did not make any specific findings as to the amounts the mortgage payments made during the marriage acquired equity in the house and the duplex or whether the mortgage payments on the real estate were from marital or nonmarital funds. Nor did it make any specific findings on appreciation.

The decree granted joint legal custody of the couple's minor child and granted sole physical custody of the minor child to Jennifer, subject to Jason's parenting time. Jason was ordered to pay child support, and the parties were ordered to split expenses related to the minor child.

Jason then filed this appeal. Jennifer cross-appealed.

### Motions on Appeal

Jason's counsel filed his appellate brief on July 31, 2025. The next day, Jason's counsel submitted a replacement brief in which he added a required section that was missing from his original brief but made no other changes to the original brief's content. At oral argument, Jason's counsel asserted that he attempted to file the "correct version" of his brief the day after its initial filing. Despite this assertion, however, there is no record of any such filing. Jason's counsel made no attempts to address the questionable contents of his brief until after Jennifer

filed a motion to strike Jason's brief and dismiss Jason's appeal. In her motion, filed on August 26, Jennifer asserted that Jason's appellate brief contained many fictitious citations, citations to real cases with incorrect holdings, and nonexistent quotations. Jennifer argued that these errors violated the Nebraska Rules of Professional Conduct, the Nebraska Court Rules of Appellate Practice, and Nebraska's statute governing frivolous actions. Jennifer's motion highlighted examples of fake or incorrect citations and provided a chart showcasing several examples of fake or incorrect citations.

In lieu of responding to Jennifer's motions, Jason's counsel filed two nearly identical motions for leave to file a corrected appellate brief. In his motions, Jason's counsel stated the citations in the original brief were "sloppy" due to "copying and pasting . . . from Westlaw without verifying the official reporter." Jason's counsel asserted he did not invent cases, did not rely on AI, and did not attempt to mislead the court. Jason's counsel also addressed a few of the incorrect citations from the original brief.

Jason's counsel attributed the errors to the circumstances surrounding the filing of the brief. First, he explained that his motion for extension of time to file the brief was not granted until July 31, 2025—the date the brief was due. Jason's counsel claimed this extension left him with "essentially no additional time to finalize the brief." Second, Jason's counsel explained that his computer suffered a "catastrophic screen crack" on July 31 while he was traveling, leaving him without a computer for 5 days. Jason's counsel argued that granting leave to replace his original brief would not prejudice Jennifer, would protect the court's integrity, and would protect Jason's right to an appeal. We overruled each motion.

After the case was moved to our docket, Jennifer filed her appellate brief. Jason's counsel moved for a time extension to reply to Jennifer's brief, but his motion was overruled for failure to show exceptional cause. Jason's counsel nonetheless filed an untimely reply brief, which was stricken.

Jason's Operative Brief

Jason's July 31, 2025, brief contains numerous citations to fake cases, real cases with fake quotations, real cases with mischaracterized holdings, and Nebraska statutes and court rules with fake quotations. Jason's brief was signed and certified by his counsel. An example of Jason's reliance on fictitious authority is as follows: "In Kennedy v. Kennedy, 27 Neb. App. 510, 934 N.W.2d 57 (2019), the court reversed a parenting time order because it lacked specific findings explaining why the reduced parenting time was in the child's best interest."[1] "*Kennedy v. Kennedy*" is the name of a real case decided by the Nebraska Court of Appeals in an unpublished memorandum opinion filed in 2019, which does not correspond to the citation given.[2] Furthermore, the unpublished memorandum opinion does not stand for the proposition advanced by Jason. The only real "*Kennedy v. Kennedy*" case decided by a Nebraska appellate court in 2019 does not discuss parenting time, and it does not mention the need for specific findings. Further, Jason's brief includes a block quotation from "Kennedy v. Kennedy" that does not exist in the unpublished memorandum opinion; nor does it appear to exist anywhere in Nebraska case law. Jason's brief cites repeatedly to "Kennedy v. Kennedy, 27 Neb. App. 510, 934 N.W.2d 57 (2019)," to support his contention that joint custody is favored when, in reality, Nebraska law does not favor or disfavor any particular custody arrangement and requires custody determinations to be made based on the best interests of the child.[3]

Jason's brief also cites real cases with real reporter citations but misstates what the cases stand for or includes quotes

---

[1] Brief for appellant at 13.

[2] See *Kennedy v. Kennedy*, No. A-18-824, 2019 WL 2754981 (Neb. App. July 2, 2019) (selected for posting to court website).

[3] See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

that cannot be found in the cited cases. For example, Jason's brief cites to "*Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022)," a real decision from this court, to support a proposition that an appellate court will reverse a denial of attorney fees when the record demonstrates that one party caused delay or engaged in bad faith litigation tactics and the trial court failed to consider or account for those actions.[4] *Simons v. Simons*[5] does not support this proposition or address the denial of attorney fees. The only mention of attorney fees in *Simons* is in the standard of review in a section discussing alimony. Further, Jason's brief provides, "'A party is entitled to be informed of the issues raised, and cannot be expected to defend against a theory not disclosed in the pleadings.' *Simons v. Simons*, 312 Neb. 136, 147, 978 N.W.2d 121, 131 (2022)."[6] This quote attributed to *Simons* does not exist within the case, nor does it appear to exist in Nebraska case law. *Simons* is misstated and misquoted several more times throughout the brief.

Jason's brief also contains misquotations from Nebraska statutes and Supreme Court rules. For example, Jason's brief purports to quote Neb. Rev. Stat. § 43-2923(1) (Reissue 2016) as stating, "'Parenting arrangements should ensure frequent, continuing, and meaningful contact with both parents as is in the child's best interests.'"[7] However, § 43-2923 actually states in part, "The best interest of the child require: (1) A parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children."

Jason's brief contains many more incidents of his reliance on fictitious authority, real cases with fictitious holdings, and

---

[4] Brief for appellant at 31.

[5] *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

[6] Brief for appellant at 28.

[7] *Id*. at 8.

fictitious quotations. The following chart depicts the many problematic citations in Jason's brief:

| Jason's Citation | Result of This Court's Review |
|---|---|
| *Kennedy v. Kennedy*, 27 Neb. App. 510, 934 N.W.2d 57 (2019) | • Fictitious case using real case name from unpublished memorandum opinion<br>• Cited and quoted five times throughout brief<br>• Quotes and holding do not exist in the real unpublished memorandum opinion or other Nebraska case law |
| *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 874 N.W.2d 211 (2016) | • Incorrect citation<br>• Does not support cited proposition<br>• Fictitious quotations |
| Neb. Rev. Stat. § 43-2923 | • Real statute<br>• Fictitious quotations and misleading application throughout brief |
| *Schrag v. Spear*, 312 Neb. 88, 978 N.W.2d 591 (2022) | • Incorrect citation<br>• Fictitious quotations |
| Neb. Ct. R. § 4-204 | • Real court rule<br>• Fictitious quotation |
| *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018) | • Real case<br>• Fictitious quotations and holding throughout brief |

| *State ex rel. A.E. v. Buckhalter*, 273 Neb. 443, 730 N.W.2d 340 (2007) | • Real case<br>• Does not stand for proposition cited to support |
| --- | --- |
| *Schuman v. Schuman*, 27 Neb. App. 1004, 939 N.W.2d 374 (2020) | • Incorrect citation |
| Neb. Ct. R. § 4-215 | • Real court rule<br>• Fictitious quotation |
| *Miller v. Miller*, 227 Neb. 71, 416 N.W.2d 358 (1987) | • Fictitious case<br>• Fictitious quotation |
| *Crawford v. Crawford*, 263 Neb. 37, 637 N.W.2d 505 (2002) | • Incorrect citation<br>• Fictitious quotation |
| *Brown v. Brown*, 260 Neb. 954, 620 N.W.2d 82 (2000) | • Incorrect citation<br>• Does not support cited proposition |
| *State on behalf of Ricardo P. v. Christina R.*, 309 Neb. 705, 962 N.W.2d 315 (2021) | • Fictitious case |
| *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017) | • Real case<br>• Fictitious quotations and holding throughout brief |
| *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022) | • Real case<br>• Fictitious quotations and holding throughout brief |
| *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999) | • Real case<br>• Fictitious quotations and holding throughout brief |

| *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014) | • Real case<br>• Fictitious quotation and holding |
| --- | --- |
| *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000) | • Real case<br>• Does not support cited proposition |
| *Walker v. Walker*, 9 Neb. App. 834, 621 N.W.2d 535 (2001) | • Incorrect citation<br>• Fictitious quotation |
| *State v. Stricklin*, 29 Neb. App. 367, 904 N.W.2d 535 (2017) | • Fictitious case<br>• Fictitious quotation |

## ASSIGNMENTS OF ERROR

Jason's noncompliant, unnumbered assignments of error[8] assert that the district court (1) abused its discretion by reducing his parenting time below what was ordered in the temporary decree without making specific findings as to why the reduction was in the best interests of the minor child; (2) erred in imputing income to him at rates unsupported by the record and without making a finding that he was voluntarily underemployed; (3) failed to clarify its legal custody designation, while requiring him to contribute to direct expenses in a manner consistent with a joint custody agreement; (4) failed to consider or make findings regarding joint physical custody; (5) erred in selecting August 1, 2016, as the date of marital separation; (6) abused its discretion in awarding Jennifer a $60,000 dissipation credit; (7) erred in awarding Jennifer $16,616 in equalization based on vague or incomplete property valuation evidence and an inconsistent application of valuation dates; and (8) abused its discretion by denying his

---

[8] See Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2025) (numbering required).

request for attorney fees. Jason also asserts the combined effect of the above errors rendered the proceedings fundamentally unfair, warranting reversal and a new trial.

On cross-appeal, Jennifer asserts that the trial court erred in failing to include the real estate when equalizing the marital estate.

## STANDARD OF REVIEW

[1,2] Where a brief of a party fails to comply with the mandate of § 2-109(D)(1)(e), we may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error.[9] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[10]

[3] The extent to which the property is marital versus nonmarital presents a mixed issue of law and fact.[11] The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is a legal question and not a matter of the court's discretion.[12]

[4] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[13]

---

[9] *Swicord v. Police Stds. Adv. Council*, 309 Neb. 43, 958 N.W.2d 388 (2021).

[10] *Id.*

[11] *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

[12] *Id.*

[13] *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021).

[5] In a dissolution proceeding subject to de novo review, the determination of the weight that should be given expert testimony is uniquely the province of the fact finder.[14] The same is true of lay testimony.

[6] Appellate courts do not generally consider arguments and theories raised for the first time on appeal.[15]

## ANALYSIS

### Fictitious Cases and Quotations in Jason's Brief

This matter presents a novel issue for Nebraska courts: the use of fictitious, potentially AI-generated cases, holdings, and quotations. In both his motion to file a corrected brief and at oral argument, Jason's counsel asserted that AI was not used in the drafting of the filed appellate brief. Instead, Jason's counsel attributed the fictitious cases and quotations in his brief to a screen crack on his laptop and his filing the wrong draft of the brief. Regardless of whether AI was used in the preparation of Jason's appellate brief, our analysis in this case is ultimately the same.

The use of generative AI has been growing over the past few years and, if used with "caution and humility," can provide benefits to professionals who use it.[16] Unfortunately, the unchecked use of generative AI also leads to court filings that contain realistic but misleading citations and legal assertions that are either entirely made up or from a real source that does not contain the purported language cited.[17] These

---

[14] *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

[15] *Simons v. Simons, supra* note 5.

[16] John G. Roberts, Jr., *2023 Year-End Report on the Federal Judiciary* at 5 (Dec. 31, 2023) (available at https://www.supremecourt.gov/publicinfo/year-end/2023year-endreport.pdf) (last visited Mar. 13, 2026).

[17] See Ralph Artigliere, *AI Hallucinations in Court: A Wake-Up Call for the Legal Profession*, JD Supra (Jan. 22, 2025), https://www.jdsupra.com/legalnews/ai-hallucinations-in-court-a-wake-up-4503661/ (last visited Mar. 13, 2026).

outputs are often referred to as "hallucinations."[18] Submission of these hallucinations creates serious issues. Dealing with hallucinations in court filings wastes an opposing party's time and money, wastes the court's time and resources, and causes reputational harms to the legal system.[19] As one court recognized, "Technological advances are commonplace and there is nothing inherently improper about using a reliable [AI] tool for assistance. But existing rules impose a gatekeeping role on attorneys to ensure the accuracy of their filings."[20] We hold that the submission of fictitious authority to a court, whether through generative AI or not, can be resolved by application of our existing rules of professional conduct and court rules.[21]

An attorney's duty of candor toward a tribunal is described by Neb. Ct. R. of Prof. Cond. § 3-503.3(a)(1) (rev. 2016), which states that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." This duty of candor toward the tribunal seeks to avoid conduct by attorneys that undermines the integrity of the adjudicative process. Under § 3-503.3, comment 2, "the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false."

We have applied this duty of candor in disciplinary proceedings when an attorney has made false statements in court pleadings,[22] misrepresented a parenting plan as being

---

[18] See *id.*

[19] See *id.*

[20] *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023).

[21] See, e.g., *id.* (sanctioning attorneys under Fed. R. Civ. P. 11 for submitting fictitious legal authority, in violation of court rules and New York's rules of professional conduct).

[22] See *State ex rel. Counsel for Dis. v. Pearson*, 310 Neb. 256, 965 N.W.2d 28 (2021).

approved by both parties,[23] and made repeated misrepresentations of fact to opposing counsel and the district court concerning authority to settle a case.[24] Courts in other jurisdictions have applied similar rules of candor toward the tribunal in cases concerning the submission of fictitious legal authority.[25]

Under our rules of professional conduct, an attorney also has an ongoing duty to provide competent representation.[26] Specifically, § 3-501.1 provides that competent representation "requires the legal knowledge, skill, thoroughness, preparation and judgment reasonably necessary for the representation." Comment 6 to § 3-501.1 explains that keeping "abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology," is part of providing competent representation. Similarly, under Neb. Ct. R. of Prof. Cond. § 3-501.3, an attorney must also act with reasonable diligence in representing a client.

Further, under Neb. Ct. R. of Prof. Cond. § 3-503.1, an attorney must avoid asserting a claim or contention that is not grounded on a nonfrivolous basis. Comment 2 to § 3-503.1 states a position is frivolous if it is not grounded in a good faith argument for an extension, modification, or reversal of existing law. As another court has explained, "A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law."[27]

---

[23] See *State ex rel. Counsel for Dis. v. Schmidt*, 303 Neb. 755, 930 N.W.2d 577 (2019).

[24] See *State ex rel. Counsel for Dis. v. Bouda*, 278 Neb. 380, 770 N.W.2d 648 (2009).

[25] See, e.g., *U.S. v. Hayes*, 763 F. Supp. 3d 1054 (E.D. Cal. 2025); *Mata v. Avianca, Inc., supra* note 20.

[26] See Neb. Ct. R. of Prof. Cond. § 3-501.1 (rev. 2017).

[27] *Mata v. Avianca, Inc., supra* note 20, 678 F. Supp. 3d at 461.

[7] Finally, under Neb. Ct. R. of Prof. Cond. § 3-508.4(c) (rev. 2016), an attorney engages in professional misconduct when they "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." This court has held that proof of actual intent to deceive or defraud is not required to demonstrate an attorney engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation.[28] Instead, the focus of the inquiry is on the effect of the lawyer's conduct.[29]

[8] Every attorney admitted to practice in the State of Nebraska is subject to the exclusive disciplinary jurisdiction of this court.[30] Acts or omissions by members of the Nebraska bar which violate the Nebraska Rules of Professional Conduct are grounds for discipline.[31] Here, Jason's counsel's conduct of submitting a brief filled with fictitious cases, fictitious quotations, fictitious holdings, and fictitious quotations from statutes and court rules certainly raises potential violations of the Nebraska Rules of Professional Conduct, as set forth above.

Jason's counsel made numerous false statements of law throughout the brief. Exercising due diligence—a simple search of Westlaw and LexisNexis legal databases, the Nebraska Revised Statutes, Nebraska Supreme Court rules, or the free Nebraska Appellate Courts Online Library—would have made clear to Jason's counsel that any number of the fictitious quotations, from cases and statutes alike, did not exist, that the "Kennedy v. Kennedy" case relied upon is not a real case, and that the purported holdings of the real cases cited did not match the actual holdings of those cases.

---

[28] *State ex rel. Counsel for Dis. v. Hanson*, 305 Neb. 566, 941 N.W.2d 193 (2020).

[29] *Id.*

[30] See Neb. Ct. R. § 3-301 (rev. 2025).

[31] See Neb. Ct. R. § 3-303(B). See, also, *State ex rel. Counsel for Dis. v. Glass*, 320 Neb. 201, 26 N.W.3d 538 (2025).

While it is unclear whether Jason's counsel made these false statements of law "knowingly," per § 3-503.3, we agree with those courts that have found conscious avoidance[32] or failing to adequately review a brief and verify that the law presented is good law[33] satisfies the "knowingly" requirement of the duty of candor toward the tribunal. Even if initial submission of the fictitious authority was not done "knowingly," counsel failed to attempt to correct the false statements of law until after being made aware by Jennifer's motion to strike Jason's brief and dismiss Jason's appeal. At oral argument, Jason's counsel conceded, only after being pressed by questioning from the bench, that the authority cited in his brief was not properly grounded in Nebraska law, despite his previous assertion to the contrary in his motion for leave to file a corrected brief. This demonstrated a failure of his duty of candor toward this court.

Jason's counsel's submission of a brief with numerous fictitious citations and quotations is a serious dereliction of counsel's duty to serve as an officer of the court. "Citing nonexistent case law or misrepresenting the holdings of a case is making a false statement to a court. It does not matter if [generative AI] told you so."[34] Supporting arguments in such a manner is certainly "so wholly without merit as to be ridiculous."[35] We refer Jason's counsel to the Counsel for Discipline to investigate the filing of Jason's appellate brief rife with fictitious and misrepresented authority.[36]

---

[32] See *Mata v. Avianca, Inc., supra* note 20.

[33] See *Davis v. Marion Cnty. Superior Ct. Juv. Det. Ctr.*, No. 1:24-cv-01918-JRD-MJD, 2025 WL 2502308 (S.D. Ind. Sept. 2, 2025).

[34] Maura R. Grossman et al., *Is disclosure and certification of the use of generative AI really necessary?*, 107 Judicature 68, 75 (2023).

[35] *White v. White*, 320 Neb. 256, 276, 26 N.W.3d 924, 939 (2025).

[36] See § 3-303(B). See, also, *State ex rel. Counsel for Dis. v. Glass, supra* note 31.

Jason's counsel's explanation that his citations were "sloppy" due to "copying and pasting . . . from Westlaw" could apply to a handful of citations where the reporter information is slightly off but cannot explain the numerous fictitious quotations, which cannot be located either in the cases they are purported to be from or in the larger Nebraska jurisprudence. It also does not explain how a few cases appear to be made up entirely. Jason's counsel's assertion that he simply filed the wrong draft of the appellate brief lacks credibility.

In short, Jason's appeal is entirely meritless because it is not grounded on proper legal foundations when the supporting brief is riddled with fabricated citations and quotations. However, in fairness to Jason, we exercise our discretion to review his assignment of error for plain error. In doing so, we find no plain error exists.

We now turn to the question of what sanction is warranted in this matter. Due to the widespread nature of the fictitious authority and application in Jason's brief, we, pursuant to our inherent authority, order Jason's appellate brief stricken and his appeal dismissed.[37] We find these sanctions to be appropriate in this case to address the issue of Jason's counsel's submitting fictitious authority and to protect the integrity of the judicial process. This finding, however, does not preclude Jennifer from filing for an award of attorney fees.

We caution attorneys and self-represented litigants alike to take care to verify the truth and accuracy of their filings. Whether using AI or not, the obligations of candor, competency, diligence, and making good faith arguments remain the same. AI, like other technological tools, can be a benefit to the legal community, but it must be used with caution and humility. Anything less imperils the reputation of the legal profession and wastes time and resources of both the courts and litigants.

---

[37] See, e.g., *Pillay v. I.N.S.*, 45 F.3d 14 (2d Cir. 1995) (appellate court has inherent authority to dismiss appeal as frivolous).

Jennifer's Cross-Appeal

On cross-appeal, Jennifer does not contest 2016 as the date of separation for purposes of property division but argues the court erred by failing to award her an equalization payment of $44,117 to account for the alleged marital interest in their respective real estate because "each party paid down their mortgages during the marriage."[38]

Focusing on Jason's duplex that he purchased for approximately $143,000 in 2005, Jennifer asserts that, under *Stava v. Stava*,[39] a marital interest in Jason's duplex was created through these mortgage payments. There was no evidence at trial of the initial amount of the mortgage or of the amount of any mortgage payments or principal balances before 2023. Nevertheless, Jennifer points out it was generally Jason's burden to show the property was nonmarital.[40] Thus, she believes the district court erred by failing to use her $169,012 estimation of the duplex's value in 2016 when they separated, minus the 2023 mortgage balance of $97,279.36, to find a $71,732.64 marital interest in the otherwise separate property. We disagree.

Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process.[41] Jennifer's cross-appeal involves the first step, which is to classify the parties' property as marital or nonmarital.[42] The burden of proof rests with the party claiming that the property is nonmarital.[43] The manner and method of acquisition involve questions of fact, which we review de novo on the record, but the classification of the

---

[38] Brief for appellee on cross-appeal at 37.

[39] *Stava v. Stava, supra* note 11.

[40] See *id.*

[41] *Id.*

[42] See *id.*

[43] *Id.*

property under those facts is a legal question and not a matter of the court's discretion.[44]

[9-11] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.[45] Appreciation, be it active or passive, in the marital interest is always marital; it is simply part of the marital property.[46] In contrast, property that a party brings into the marriage is usually excluded from the marital estate.[47] Premarital equity in real property is a nonmarital asset which, if established, should be set aside as separate property.[48] This includes its passive appreciation.[49]

In *Stava*, we adopted the "source of funds" rule that acquisition of encumbered property only occurs when and to the extent it becomes unencumbered, including by paying off the principal of an encumbering loan.[50] In other words, "acquisition" of property in the first instance can be an ongoing process and occurs only as it is paid for, because the value of property is the equity and not the mere legal title.[51] The use of marital funds to pay down the mortgage on what was initially separate property acquires the property during the marriage to the extent the principal is paid, creating a proportionate marital interest in that property.[52] When acquisition occurs via payments on the principal of encumbering debt, the marital estate receives not just a refund of

---

[44] *Id*.

[45] *Id.*

[46] *Id*.

[47] *Id*.

[48] See *id*.

[49] *Id*.

[50] See *id*.

[51] See *id*.

[52] *Id.*

the monetary contribution toward the principal of the loan, but also a fair return on its investment, which includes passive appreciation.[53]

We set forth in *Stava* a mathematical formula that can be utilized to determine the marital interest in a property that has passively appreciated during a marriage where marital funds have contributed to its equity. The formula is based on a percentage interest derived from the portion of equity acquired through mortgage payments made from marital funds versus nonmarital funds. It requires the value of the property at the time of division, the amount of the marital contribution toward the equity, and the total contribution toward the equity from both marital and nonmarital funds.

The facts presented in *Stava* affirmatively established both that marital funds were used to pay down the principal balances of encumbering debts on the subject properties and that the properties acquired before the marriage had passively appreciated during the marriage. There was also evidence of the exact amounts of the marital and nonmarital contributions toward the equity in the subject properties. Finally, in *Stava*, a certified appraiser provided valuations of the properties.

In contrast, here there was conflicting lay testimony as to whether the duplex had appreciated at all during the relevant time and as to what its value was in 2016. Moreover, while there was evidence of the existence of a first mortgage on the duplex, and its balance in 2023, there was no evidence as to when the mortgage was incurred or in what amount. While the parties vaguely indicated they each paid their respective mortgages, even if we presume this insufficient to overcome a presumption that those payments were with marital funds, there was no evidence of what amounts, if any, were paid toward the principal during that time.

In *Stava*, we recognized the district court has discretion in applying the source of funds rule and that the mathematical

---

[53] *Id.*

formulas set forth therein may not be the only method of applying the source of funds rule in every situation. But we find little support for the calculation that Jennifer suggests, which simply subtracts the 2023 first mortgage debt from her nonprofessional estimation of the duplex's 2016 value.

[12] While the burden of proof rests with the party claiming that the property is nonmarital,[54] Jason established he owned the duplex before the marriage. Indeed, he established he owned it approximately 7 years before the marriage in 2012 and another 7 years after their separation in 2016. In contrast, the parties were only together for 3 years, and there was no evidence that marital contributions reduced the principal balance of any encumbering loan during that 3-year period. It would be mere speculation to calculate any marital interest in Jason's duplex without evidence of amounts that the marital versus nonmarital funds contributed to its equity. Under the facts presented at trial, it would be mere speculation to even try to calculate a refund amount corresponding to marital payments toward the principal of Jason's duplex.

[13] A fact finder cannot reach conclusions based on guess, speculation, or conjecture, because conjecture, speculation, or choice of quantitative possibilities are, of course, not proof.[55] We are mindful that the mortgage information may have been in Jason's possession or under his control. However, Jennifer did not seek enforcement or sanctions below in relation to her request to produce, and she does not raise any error on appeal with respect to discovery.[56] Moreover, even under Jennifer's calculations, the court's distribution of the alleged marital interest in the parties' respective real estate would not rise to the level of an abuse of discretion. Under these facts, we will not reverse the district court's determination that both properties were nonmarital.

---

[54] *Id.*

[55] *Estate of Block v. Estate of Becker*, 313 Neb. 818, 986 N.W.2d 726 (2023).

[56] See *Simons v. Simons, supra* note 5.

## CONCLUSION

As a result of Jason's appellate brief's containing numerous fake and misleading citations, his counsel will be referred to the Counsel for Discipline for violation of the duty of candor to the tribunal, his brief is stricken, and his appeal is dismissed. On Jennifer's cross-appeal, we find no error in the district court's order and affirm the decree of dissolution.

AFFIRMED IN PART, AND IN PART DISMISSED.

VAUGHN, J., not participating.

STACY, J., concurring.

This appeal marks our first opportunity to consider how courts should respond when a party files a brief that is riddled with fictitious case citations, fabricated quotes, and arguments that materially misstate the controlling legal authority. Whether such a brief is filed by a lawyer or by a self-represented litigant, it is obvious that any attempt to persuade a court or to oppose an adversary by relying on fabricated legal authority is an abuse of the judicial system,[1] and such conduct may warrant the imposition of appropriate sanctions under a court's inherent authority.[2]

A review of the evolving case law in this area indicates that courts in other jurisdictions have imposed a variety of sanctions against lawyers and selfrepresented parties whose filings contain fabricated legal authority, including ordering monetary sanctions to be paid by the responsible attorney

---

[1] See, *Park v. Kim*, 91 F.4th 610 (2d Cir. 2024); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023).

[2] See *Fletcher v. Experian Information Solutions, Incorporated*, No. 2520086, 2026 WL 456842 (5th Cir. Feb. 18, 2026) (observing that courts have inherent power to impose sanctions for abusing judicial process by filing brief containing fabricated cases and quotes). See, generally, *Houser v. American Paving Asphalt*, 299 Neb. 1, 15, 907 N.W.2d 16, 26 (2018) (recognizing "Nebraska courts, through their inherent judicial power, have the authority to do all things reasonably necessary for the proper administration of justice").

or party,[3] ordering reasonable attorney fees to be paid to the opposing party,[4] ordering the relevant filing or brief to be stricken,[5] or ordering the party's appeal to be dismissed.[6] And when the professional conduct of an attorney is called into question because he or she filed documents that contain fabricated legal authority, courts routinely refer the matter to the relevant disciplinary body for investigation of possible ethical violations.[7]

Here, the appellant's counsel received fair notice, well in advance of oral argument, that the brief he filed on behalf of his client contained a staggering number of fictitious citations, fabricated quotes, and misleading propositions and arguments. And during oral argument, counsel was given a meaningful opportunity to explain how and why that occurred and to show good cause why sanctions should not be imposed. Because counsel provided no plausible good faith explanation for the

---

[3] See, *Fletcher, supra* note 2 (ordering attorney to pay sanction of $2,500 for including quotations, citations, and assertions in brief not supported by case law); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) (ordering sanctions against plaintiffs' attorneys for citing fake cases); *Mata, supra* note 1 (imposing $5,000 sanction against attorneys and law firm for citing multiple nonexistent cases in brief and submitting fabricated excerpts from nonexistent cases to court).

[4] See, *In re Kheir*, 674 B.R. 631 (S.D. Tex. 2025) (ordering attorney to pay opposing party attorney fees and court costs for citing nonexistent cases); *In re Kenney*, 422 So. 3d 905 (La. App. 2025) (same); *Kruse v. Karlen*, 692 S.W.3d 43 (Mo. App. 2024) (sanctioning pro se party $10,000 in attorney fees where party submitted 22 fictitious citations in brief).

[5] See, *Grant v. City of Long Beach*, 96 F.4th 1255 (9th Cir. 2024) (striking appellant's brief citing nonexistent cases and misrepresenting holdings of cases); *Matter of Samuel*, 82 Misc. 3d 616, 206 N.Y.S.3d 888 (2024) (striking pleading citing five nonexistent cases).

[6] See, *Grant, supra* note 5 (striking brief with fictitious cases and dismissing appeal); *Kruse, supra* note 4.

[7] See, *Park, supra* note 1; *Johnson v. Dunn*, 792 F. Supp. 3d 1241 (N.D. Ala. 2025). See, also, *Dehghani v. Castro*, 782 F. Supp. 3d 1051 (D.N.M. 2025) (ordering counsel to selfreport to state bar's disciplinary board for filing brief containing nonexistent cases).

extensive fabrications in the brief that he signed and filed, I agree with the majority that this court has the inherent authority to strike the appellant's brief in its entirety[8] and that we should do so.

I also agree that to ensure the protection of the public, this court has an obligation to report counsel conduct to the Counsel for Discipline of the Nebraska Supreme Court so that possible violations of the Nebraska Rules of Professional Conduct can be thoroughly investigated and any appropriate disciplinary action commenced.[9] And I do not understand anything in the majority's opinion to have prejudged either the scope or outcome of the attorney disciplinary process. Instead, in the appeal before us for review, this court has merely exercised its inherent authority, sua sponte, to impose appropriate and measured sanctions in response to the filing of an appellate brief that was rife with fabricated legal authority, that failed to comply with the appellate briefing rules,[10] and that threatened to undermine the integrity of the appellate process.

Finally, although I agree completely with the majority's decision in this case to review the record for plain error and with its conclusion that no plain error exists, I think the proper disposition under such circumstances is to affirm the judgment of the district court, rather than to dismiss the appeal. Once we struck the appellant's brief as a sanction, we

---

[8] See, e.g., *Kellogg v. Mathiesen*, 320 Neb. 223, 26 N.W.3d 651 (2025) (stating rule that when appellant's brief fails to comply with court rules, appellate court either may proceed as though party failed to file brief and provide no review at all or may examine proceedings for plain error); *Houser, supra* note 2. See, also, Neb. Ct. R. App. P. § 2109(D)(1)(e), (f), and (g) (rev. 2025) (requiring briefs to concisely state each alleged error, include "the legal propositions urged as controlling," and argue each error using relevant propositions of law and legal authority); Neb. Ct. R. App. P. § 2110(A) (rev. 2022) (providing if appellant fails to file brief, appeal is subject to dismissal).

[9] See Neb. Rev. Code of Judicial Conduct § 5302.15(B) and (D).

[10] See §§ 2109(D) and 2110(A).

undoubtedly had the authority, under both our inherent power and the appellate court rules, to dismiss this appeal without conducting any review at all. But since we exercised our discretion to examine the record for plain error and found none, we necessarily engaged in appellate review. I therefore think affirmance is the more appropriate disposition, but I acknowledge the practical reality that the outcome is the same whether the judgment is affirmed or the appeal is dismissed.[11]

───────────

[11] See In re Estate of Marsh, 145 Neb. 559, 17 N.W.2d 471 (1945) (recognizing general rule that dismissal of appeal without examining merits operates as affirmance of judgment appealed).